## BURDON CENTRAL SUGAR REFINING CO. v. FERRIS SUGAR MANUF'G CO. (PAYNE et al., Interveners).

### (Circuit Court, E. D. Louisiana. December 7, 1896.)

### No. 12,355.

1. **LANDLORD AND TENANT—LIEN ON FUTURE PROPERTY.**
   An equitable lien in favor of the lessor of a sugar house, on future bounties paid to the lessee for sugar there manufactured, may be created by stipulation in the lease.

2. **SAME—LESSOR'S STATUTORY LIEN—OBLIGATIONS OF LEASE.**
   The lessor's privilege given by Rev. Civ. Code La. art. 2705, as security for the rent and "other obligations of the lease," secures an unpaid balance due the lessor of a sugar house for crops of cane sold to the lessee, under a stipulation in the lease that the lessor shall sell, and the lessee buy, such crops, on conditions specified.

3. **SAME—D FAULT OF LESSEE—DAMAGES.**
   The lessor cannot recover for losses caused by the lessee's default, where he might have protected himself against such losses by due diligence.

The original bill in this case was filed by the Burdon Central Sugar Refining Company against the Ferris Sugar Manufacturing Company, praying that a receiver be appointed for the latter company. After the appointment of the receiver, J. U. Payne & Co. filed a petition of intervention, setting up a contract between them and the defendant, by which they had leased to defendant a certain sugar house, with the machinery, etc., for a period of 10 years, at an annual rental of $2,000. The lease contained a stipulation that the lessee should buy, and the lessors sell, on specified conditions, all the cane grown on the lessors' plantations, a certain part of the purchase money to be paid weekly, the balance to constitute "a lien and privilege, to the full extent of such balance, on the first bounty money received" by the lessee on sugar produced from cane ground on the leased premises; the lessee agreeing "to consecrate solely to the payment of such balance all bounty payments so received until the whole of the said balance shall have been paid." Interveners alleged various breaches of the contract by the defendant, claimed, among other debts due them from defendant, certain balances for cane delivered under the contract and for bounty due thereon, and also a large sum for cane alleged to have been lost by reason of defendant's failure to receive it according to the contract, for all of which they claimed a lessor's privilege on property of the defendant found on the leased premises.

Thos. J. Semmes, for Receiver of Ferris Sugar Manufacturing Co.
Rouse & Grant, for Burdon Central Sugar Refining Co.
Fenner, Henderson & Fenner, for interveners.

PARLANGE, District Judge. Three main questions are presented in this matter, to wit: (1) Have the interveners an equitable lien on the sugar bounty? (2) Is the unpaid balance of the price of sugar cane sold to the Ferris Sugar Manufacturing Company secured by interveners' lessor's privilege? (3) Are interveners entitled to damages for the loss of part of their crops?

1. The learned counsel for the receiver admits in his brief that future property may be assigned, but he insists that an equitable lien on future property can only be created by assignment or mortgage. While further admitting that there are many cases in which a fund or property in futuro is susceptible of assignment in equity, he states that he can find no case which extends the principle to the establishment of a lien on incorporeal rights to be acquired in the future, by a mere contract that the creditor shall have a lien. He concedes, however, that in such a case the lien could be created by assignment or mortgage. He urges that:

"A mere agreement to appropriate a fund when it comes into existence, or to give a lien thereon, does not operate as a lien, but an assignment or mortgage of such prospective fund is effectual, so as to give the assignee or mortgagee an equitable right in the fund, when it comes into existence."

It may well be that an equitable lien will not result from a mere promise to pay a debt out of a fund not then in esse. The legal mind is fully satisfied with the result reached in the typical case of Trist v. Child, 21 Wall. 441. In that case, Justice Swayne, as the organ of the court, said:

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. * * * But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund pro tanto, either by giving an order, or by transferring it otherwise, in such a manner that the holder is authorized to pay the amount directly to the creditor, without the further intervention of the debtor."

It is clear that no equitable lien is created when one does nothing to set aside a fund in futuro for the payment of his debt, nor to dispose of his rights in the fund, nor to incumber it, but merely promises to pay the debt from the fund, should it ever come into existence. Such a case rests entirely upon the personal obligation of the promisor. But a wholly different case is presented when one clearly and irrevocably divests himself of his rights in a thing to be acquired in the future, or pledges or assigns the property as a security for his debt. He thus consummates an agreement by which, from the moment the agreement is made, the creditor is invested with a right of which he cannot be deprived if the property is ever created. It is true that the right remains dormant until the property comes into being, but the right, though dormant, exists in the meantime.

Even an agreement to give a mortgage has been held to create a lien (1 Jones, Liens, § 77, and cases there cited); also, a promise to give any other security (Id. § 78, and cases there cited). "Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated," etc. 13 Am. & Eng. Enc. Law, verbo "Liens," p. 608, and cases there cited. These cases, arising from promises to give security, come under the maxim

that "equity regards as done what ought to be done," and they do not in any manner conflict with the doctrine of Trist v. Child, supra. The agreement to give the property as security for the debt (taken in equity, as if the agreement were executed) is a sufficient appropriation to meet the requirements of the case just cited.

The case at bar may be said to be stronger than a case based upon a promise to give security. The contract in the instant case provided that a lien should exist, and did not merely promise to give a lien in the future. When it is admitted, as in this case, that property in futuro may be assigned or mortgaged, I am unable to understand how it can be contended, consistently with the admission, that a lien upon future property cannot be created by an express stipulation that a lien shall exist. There is nothing sacramental in the words "to assign" or "to mortgage." In all cases of assignments to secure debts, the whole object sought to be attained is not the assignment per se, but the creation of a right to be paid out of the property, or fund,—in other words, a lien. While, in an assignment, the parties may make no mention of the lien, a court of equity will say that the equitable result of the assignment is a lien. Equity jurisprudence would be in an irrational condition if it were true that an assignment of property in futuro creates a lien, though no lien is expressly stipulated by the parties, but that if the parties, pretermitting the assignment, expressly stipulate for a lien, then no lien shall be created. The case at bar presents a question of express, not of implied, lien. In plain and unambiguous words, the parties created a lien by express terms. The contract now before the court (article 13) distinctly provides that the unpaid balance of the price of the sugar cane "shall operate as a lien and privilege on the bounty," and also that "the parties of the second part covenant and agree to consecrate solely to the payment of such balance all bounty payments so received by them until the whole of such balance shall be paid." The matter is therefore entirely free from the difficulties which sometimes attend questions of implied liens. It is perfectly plain to me that the parties agreed that a lien upon the bounty, to secure any unpaid balance of the purchase price of sugar cane, should exist from the instant the sugar bounty was paid, and that no further act on the part of the Ferris Sugar Manufacturing Company, with regard to the creation of the lien, was necessary or contemplated by the contract. The matter reduces itself to the question whether parties can, by clear and express terms, create a lien upon future property. That question almost answers itself.

"An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. Equitable liens by contract of the parties are as various as are the contracts which parties may make." 1 Jones, Liens, § 27.

"Whenever a positive lien or charge is intended to be created upon real or personal property not in existence or not owned by the person who grants the lien, the contract attaches in equity as a lien

or charge upon the particular property as soon as he acquires title or possession of the same. An equitable lien upon future property may be even more effectual than such a lien upon property in existence, for the registration laws apply to liens upon property in existence, but not to liens upon future property. Therefore it happens that while, as against creditors, a lien cannot be created by consent upon a personal chattel in existence at the time of such contract without registration, yet, as this rule does not apply to a contract in regard to future property, a lien effectual as against creditors may be created by agreement upon future property, such, for instance, as the products of a farm or the profits of a farm not then in existence." 1 Jones, Liens, § 42, and authorities there cited.

"By agreement, a lien may be given on any property not in existence or owned by a person at the time of the agreement, to take effect when the property comes into existence or is obtained." 8 Am. & Eng. Enc. Law, verbis "Future Acquired Property," p. 987, and cases there cited.

Justice Clifford, at the circuit, said in Barnard v. Railroad Co., 4 Cliff. 351, Fed. Cas. No. 1,007:

"Argument to show that the parties intended to create a lien or charge upon property of the kind enumerated, subsequently acquired, as well as upon property in existence and in possession, is hardly necessary, as the affirmative of the proposition is supported by the express words of the indenture of mortgage; the rule being that, when parties intend to create a lien upon property not then in actual existence, it attaches in equity as soon as the person who grants the lien acquires the possession and title of the same. Mitchell v. Winslow, Fed. Cas. No. 9,673; Pennock v. Coe, 23 How. 117. * * * Many other authorities support the proposition that, whenever parties by their contract intend to create a positive lien or charge, either upon real or personal property, whether owned by the assignor or contractor or not, or, if personal property, whether it is then in being or not, the contract attaches in equity, as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto."

Seymour v. Railroad Co., 25 Barb. 284; Curtis v. Auber, 1 Jac. & W. 531; Langton v. Horton, 1 Hare, 556; Field v. Mayor, etc., 6 N. Y. 185.

Justice Matthews said in Peugh v. Porter, 112 U. S. 742, 5 Sup. Ct. 361, in answering the contention that the case came within the doctrine of Trist v. Child, supra:

"Here, as between Musser and Porter, on the one hand, and Peugh, on the other, there were words in the agreement of express transfer and assignment of the very fund now in dispute, though not then in existence, which, in contemplation of equity, is not material."

Justice Story, at the circuit, in Fletcher v. Morey, 2 Story, 555, Fed. Cas. No. 4,864, said:

"In equity there is no difficulty in enforcing a lien or any other equitable claim, constituting a charge in rem not only upon real estate, but also upon personal estate, or upon money in the hands of a third person, whenever the lien or other claim is a matter of agreement," etc.

In Riddle v. Hudgins, 7 C. C. A. 335, 58 Fed. 490, the circuit court of appeals for the Eighth circuit maintained an express verbal agreement that Hudgins & Bro. should have a lien on certain cattle. The court said:

"Upon the evidence in the case, it is indisputable that the intestate Nichols, at the time of his death, owed the plaintiffs the amount stated in the master's report, and that, by an express agreement between the plaintiffs and Nichols, they had a lien on the cattle and other property mentioned in the bill to secure the payment of the indebtedness. The lien, which was created by agreement of the parties in this case, is called an 'equitable lien' or an 'equitable mortgage.' It is said equitable liens by contract of the parties are as various as are the contracts which the parties may make. 1 Jones, Liens, § 27. Such liens do not depend upon the possession of the property by the creditor, as do liens at law. Nor do they depend upon any statute for their force and efficacy, and they are not affected by the registration laws. They are founded upon the contract of the parties, which may be either verbal or in writing, and they will be enforced in equity," etc. (See cases there cited.)

That such a contract as the one now under consideration is valid, that it does not come under the operation of the statute forbidding the assignment or transfer of claims against the United States, and that such a contract creates a lien enforceable in chancery, are questions which have been settled for this circuit by the court of appeals in Barrow v. Milliken, 20 C. C. A. 559, 74 Fed. 612, on appeal from this court,—65 Fed. 888. I need hardly say that the fact that the law of the state would give no lien in such a case as this can in no manner affect the question of equitable liens. Barrow v. Milliken, supra, involved the question of the enforcement of an equitable lien when the state law gives no lien. The doctrine of equitable liens would never have come into existence if it were true that one who claims such a lien must first show a lien at law. Equitable liens became necessary precisely on account of the absence of similar remedies at law. "An equitable lien is a right, not recognized at law, to have a fund or specific property, or the proceeds, applied in whole or in part to the payment of a particular debt or class of debts." 13 Am. & Eng. Enc. Law, verbo "Liens," p. 608, and cases there cited. "As equity has brought into existence liens unknown to the common law, it can enforce them by whatever means they will be rendered more efficacious of doing justice to the parties interested." Id. p. 613, and cases there cited. The equity jurisdiction of federal courts is derived from the constitution and laws of the United States, and their power and rules of decision are the same in all the states. Noonan v. Lee, 2 Black, 499. The equity jurisdiction of the federal courts is independent of the local laws of any state. Justice Story in Gordon v. Hobart, 2 Sumn. 401, Fed. Cas. No. 5,609. Equitable liens may be enforced in the federal courts, although no remedy is provided for the enforcement of such liens by the state jurisprudence in the state courts; and it has long been settled in the federal courts that the equity jurisdiction and equity jurisprudence administered in the courts of the United States are co-incident and co extensive with that exercised in England, and are not regulated by the municipal jurisprudence of the particular state where the court sits. Justice Story, in Fletcher v. Morey, supra, and cases there cited.

In Riddle v. Hudgins, supra, the circuit court of appeals for the Eighth circuit, passing on an express verbal agreement to give a lien, said, as already quoted:

. "Nor do they [equitable liens] depend upon any statute for their force and efficacy, and they are not affected by the registration laws."

The court further said:

· "The law gives no remedy by which such liens can be established and enforced. Being an equitable lien, the enforcement of it is exclusively within the province of a court of equity. 'Equity,' says the supreme judicial court of Massachusetts, 'furnishes the only means by which the property on which the charge is fastened can be reached and applied to the stipulated purpose. [Cases cited.]'"

In Kirby v. Railroad, 120 U. S. 130, 7 Sup. Ct. 430, Justice Harlan, as the organ of the court, said:

"While the courts of the Union are required by the statutes creating them to accept as rules of decision, in trials at common law, the laws of the several states, except where the constitution, laws, treaties, and statutes of the United States otherwise provide, their jurisdiction in equity cannot be impaired by the local statutes of the different states in which they sit. In U. S. v. Howland, 4 Wheat. 108, 115, Chief Justice Marshall, speaking for the court, said that as the courts of the Union have a chancery jurisdiction in every state, and the judiciary act confers the same chancery powers on all, and gives the same rule of decision, its jurisdiction must be the same in all the states. The same view was expressed by Mr. Justice Curtis in his work on the Jurisdiction of the Courts of the United States (page 13), when he observed that 'the equity practice of the courts of the United States is the same everywhere in the United States, and they administer the same system of equity rules and equity jurisdiction throughout the whole United States, without regard to state laws.'"

So, in Payne v. Hook, 7 Wall. 425, 430, it was said:

. "We have repeatedly held 'that the jurisdiction of the courts of the United States over controversies between citizens of different states cannot be impaired by the laws of the states, which prescribe the modes of redress in their courts, or which regulate the distribution of their judicial power.' If legal remedies are sometimes modified to suit the changes in the laws of the states, and the practice of their courts, it is not so with equitable. The equity jurisdiction of the courts of the United States is the same that the high court of chancery in England possesses, is subject to neither limitation nor restraint by state legislation, and is uniform throughout the different states of the Union."

See, specially, Curt. Jur. U. S. Cts., pp. 13, 14, 212–215.

· 2. The second question presented is whether the lessor's privilege secures the unpaid balance of the price of the sugar cane delivered to the Ferris Manufacturing Company. Article 2705, Rev. Civ. Code La., provides that "the lessor has, for the payment of his rent and other obligations of the lease, a right of pledge on the movable effects of the lessee which are found on the property leased." The counsel for the receiver contends that the words "and other obligations of the lease" are intended to cover those obligations which the Civil Code imposes on the lessee. These legal obligations are defined in section 3 of the title "Lease," from article 2710 to article 2726. They are mainly that the lessee shall pay the rent; that he shall enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease; that he shall commit no waste; and that he shall make certain minor repairs, if necessary. The contention is disposed of by unanimous decisions of the supreme court of the state. These cases are irreconcilable with the view advanced by the counsel for the receiver, and I do not remember even an attempt to meet the force of the adjudications.

The case of Warfield v. Oliver, 23 La. Ann. 612, was a suit brought by the lessor on a lease which provided that the lessee should repair and keep in repair the leased premises. The lessor proceeded by sequestration, and claimed the balance due him for rent, and also unliquidated damages in the sum of $5,000 for nonexecution of the obligation to repair and keep in repair. Justice Howe, as the organ of the court, said:

"The defendant moved to dissolve the writ of sequestration, on the grounds that there was no privilege for the claim of $5,000 for the nonperformance of the obligations of the lease (other than that to pay rent), the same being for damages unliquidated; that the claim for rent depended, by the terms of the lease, on a protestative condition, not yet fulfilled; and that the allegations in the affidavit were untrue. We think the motion was properly overruled. As to the first ground, the lessor has, for the payment of his rent and other obligations of the lease, a right of pledge on the movable effects of the lessee which are found on the property leased. Rev. Civ. Code, art. 2705. The 'other obligations' of this lease involved in this discussion sprang from Oliver's agreement in that instrument to put the plantation in repair, and to keep it in repair. As will be seen by the evidence in the record, this obligation was of great importance, and we see no reason to decide that it is not secured by the right of pledge above mentioned."

Fox v. McKee, 31 La. Ann. 67, was a suit by a lessor, accompanied by sequestration. The contract of lease provided that attorneys' fees upon the whole amount of the rental for five years should be paid by the lessee "in case it should become necessary at any time to sue for the collection of the rent, or any part thereof, or to enforce the conditions of the lease." The condition that attorneys' fees should be paid on the aggregate of the rental (upon the paid as well as the unpaid portions of the rental) was harsh. But Justice Spencer, as the organ of the court, said: "This, to say the least of it, was an onerous exaction, but it is 'so nominated in the bond.'" The attorneys' fees, to the date of the decree in the case canceling the lease, were allowed as a claim secured by the lessor's privilege.

In Henderson v. Meyers, 45 La. Ann. 791, 13 South. 191, Justice Breaux, as the organ of the court, passing on the question of attorneys' fees provided for in a lease, said:

"In reference to the fee of the attorney, to which objection is urged, it having been stipulated in the contract of lease, as one of its conditions, the difference between the parties justified the proceedings to secure plaintiffs' rights. We think the fee is due."

It seems clear to me that the contention of the receiver, viz. that none but the legal obligations of the lessee are secured by the lessor's privilege, is wholly without force, if the cases just cited are sound. It is plain that the lessee is under no legal obligation to repair and keep in repair the leased premises (except in the minor particulars already mentioned). Nor does the law bind the lessee to pay an attorney to sue him in case he defaults on his rent or in the performance of the other obligations of the lease. It is a question of pure local law, adjudicated, without a dissent, by three successive benches of the supreme court of the state, and it is plainly sustainable on principle.

The Civil Code of Louisiana was taken almost bodily from the Code Napoleon. While there are many particulars in which the

Codes differ, their coincidence is the rule, and their divergence the exception. French jurisprudence has always been consulted by the courts of Louisiana in construing the provisions of the Louisiana Code, which are substantially the same as the corresponding provisions of the Code Napoleon. In the present case I am materially helped by reading the decisions of the French courts and the writings of authoritative commentators on the Code Napoleon. The learned counsel for the receiver admitted in argument that, if the question now under consideration were to be decided by the provisions of the Code Napoleon, the issue must go in favor of the interveners. But he contended that the Code Napoleon and the Louisiana Code differ on the point involved. The Code Napoleon (article 2102) provides that the lessor shall have a privilege for "the repairs which the tenant is bound to make [réparations locatives], and for everything that concerns the execution of the lease." The Louisiana Code (article 2705) provides, as already stated, that "the lessor has for the payment of his rent and other obligations of the lease a right of pledge," etc. As the Louisiana Code, and the Code Napoleon as well, specially provide that the lessee shall make the "réparations locatives," it is immaterial, for the present purposes, that the framers of the Code Napoleon chose to again specially mention the tenantable repairs in the provision which establishes the lessor's privileges. Under the Code Napoleon, the lessor would have had a privilege for the tenantable repairs, even if article 2102 (Code Napoleon) had not mentioned them. Therefore the question is whether the words "and other obligations of the lease," in the Louisiana Code, have a different significance from the words "everything that concerns the execution of the lease," in the Code Napoleon. I have maturely considered the matter, and am unable to find any difference in the meaning of the two provisions. I cannot perceive that any exists. The language used in the one case conveys to my mind no meaning differing from that of the language used in the other.

Mourlon (Répétitions Ecrites sur le Code Civil, 11th Ed., 1883, vol. 3, § 1276) says:

"As the Code desires, for a well-conceived general interest, to facilitate leasing, it was compelled to secure the owner against all losses which might result from the possession of his property by a third person. For that purpose the law grants the owner a privilege: (1) 'For all the obligations which are of the essence or of the nature of the contract of lease, such as the liability to pay rentals, to repair damages caused by the fault of the lessee, and, in a more general way, all the obligations mentioned in articles 1728, '29, '32, '33, '35, '60, '64, '66, '68, '77, '78.' (2) 'For all the obligations which have been added as conditions of the contract,' such as the obligation to manure the land, to return advances of funds or live stock made by the owner to the farmer; in brief, in the words of the text, 'for everything that concerns the execution of the lease.'"

Aubry and Rau (Cours de Droit Français, 4th Ed., 1869, vol. 3, p. 144) say:

"The object of the lessor's privilege is to secure the complete execution of the lease. It applys not only to the rentals, but also to the other obligations of the lessee, such as the tenantable repairs, indemnification for deterioration occurring through his fault, legal charges which the lessor has paid for his discharge, and advances made to him under the clauses of the lease."

In support of their text, Aubry and Rau cite such authoritative commentators as Duranton, Troplong, Grenier, Zachariæ, and also a decision of the court of appeals of Douai, of April 18, 1850. Sirey 51, 2, 77.

Laurent (Droit Civil Francais, 4th Ed., 1887, vol. 29, §§ 407, 408) says:

"By execution of the lease, we understand all the obligations which the law or the contract imposes on the lessee. Those which the law establishes are considered as agreed between the parties. All, therefore, concern the execution of the contract. * * * Are advances which the lessor makes under the contract of lease to the lessees secured by his privilege? The affirmative is adopted by jurisprudence. It is incontestable when the advances concern the lease; that is to say, the rights and obligations which result from it. In this case, both the letter and spirit of the law are applicable. But if a loan of money were made to the lessee, in the contract of lease, without there being any relation between the loan and the lease, this would not be an advance. It would be an ordinary loan, and the law gives no privilege for a loan. Jurisprudence adopts this view; for, if it grants a privilege to the lessor for the advance which he makes, it is because these advances concern the lease. The owner of an iron furnace stipulates to furnish to the lessee of his furnace the wood necessary to operate it. It has been adjudged that such an advance is privileged. Such is also the case when the lessor furnishes beets to the lessee of a sugar factory. The lessor furnishes 10,000 francs to the lessee of a mill as a fund to be used in operating it. The advances being intended to operate the mill, therefore its object was the execution of the lease, and the claim is privileged."

Laurent also cites the decision of the court of appeals of Douai of April 18, 1850, referred to above. I quote from that decision as follows:

"Considering that, as regards the claim of 6,800 francs for rentals, the privilege of Decocq is not contested by the defendant, and is, besides, expressly established by article 2102 of the Civil Code; that, according to paragraph 1 of that article, the same privilege takes effect for repairs chargeable to the tenant, and for everything that concerns the execution of the lease; that it is by virtue of a clause of the lease, and for the execution of that clause, and in order to insure the operation of the factory leased, that the Decocq have delivered and furnished to Blanquart beets to value of 8,086 francs; that article 9 and following of said lease required them to plant beets on 53 hectares and 19 acres, and to furnish and deliver to the factory the entire product of the crop at the price of 16 francs per 1,000 kilos. of beets, and under a penalty of 150 francs damages for each 35 acres of beets not delivered; that all the authors and jurisprudence grant the privilege of article 2102 to the lessor, who has made advances and furnished commodities, as in this case, by virtue of a clause of the lease, and for the execution of the lease,—it is held that, under the terms of article 2102, the claim of Decocq is privileged, as well for the beets furnished as for the rentals."

It is useless to pursue further the examination of the French authorities, for they abundantly show that, under French law, the point at issue would be decided for the interveners; and the admission of the learned counsel for the receiver had fully satisfied me, before I had investigated the question, that, under the Code Napoleon, the privilege here claimed by the lessors would be sustained. Finding, as I do, that there is no difference in the effect and meaning of the textual provisions of the two Codes, all the reasons stated and considerations advanced by the French commentators apply with great force to the point in question. It is true, as Laurent states, that the loan of a sum of money for a purpose foreign to the lease would

not be secured by the lessor's privilege, although the loan might be stipulated in the lease. The mere fact that a stipulation is inserted in the contract of lease does not make it one of the "other obligations of the lease," within the meaning of article 2705 of the Civil Code of Louisiana. In each case presenting the question, it is for the courts to say whether the stipulation is one which is closely connected with the lease, and whether the object of the stipulation was a cause which operated materially in moving the lessor to consent to the lease. While cases might arise in which the application of this test would be difficult, the case at bar is not one of them. I could not readily imagine a case which would show a stipulation in a lease, beyond the payment of rental, more intimately and inseparably bound up with the lease than the stipulation in the case at bar, that the Ferris Sugar Manufacturing Company should receive, manufacture, and pay for interveners' sugar cane. The object of the interveners in leasing their sugar house was to obtain rent, and also to have greater facilities and advantages in converting their cane into sugar. The object of the Ferris Sugar Manufacturing Company in leasing was to enable the company to carry on the business of obtaining cane from the interveners and from others, and manufacturing it into sugar. Can it be said, under such circumstances, that the selling of the interveners' sugar cane to the Ferris Sugar Manufacturing Company was not a condition—an essential consideration—of the lease, both on the part of the lessors and the lessees? It seems to me the question must be answered in the negative. The counsel for the interveners called the court's attention, during the argument and in his brief, to article 25 of the contract, which declares that the parties agree that the contract is an entire one, each stipulation and obligation being a part of the consideration for every other. While this clause is very clear, I think that, even without it, the contract itself, from its nature, shows clearly that the selling of cane by the lessors to the lessees was an integral part of the lease.

In the case of Warfield v. Oliver, supra, the supreme court seemed to lay stress on the consideration that the stipulation that the lessee should repair the leased premises was of great importance to the lessor. So it was, but no more so—and, in my opinion, much less so—than it was in this case that the interveners should be able to have their cane manufactured into sugar. The interveners owned and were cultivating large plantations. It is beyond all question that when they leased their sugar house for $2,000 a year, and thus deprived themselves of all means of producing sugar from their cane, except through their lessees, a most material, essential and integral part of the contract—without which, in the very nature of things, the contract would never have been consented to—was that the lessees should take and pay for the sugar cane. It cannot be that such a stipulation, far more important to the lessors than repairs or the payment of attorneys' fees, is not an "obligation of the lease." It would be difficult to understand why the Louisiana lawmaker should refuse to protect an owner of property who might wish to lease his property for a money rental and on certain condi-

tions intimately connected with the lease,—such, for instance, as the stipulations, not unusual in Louisiana, that the lessee shall leave on the leased premises, at the expiration of the lease, a certain number of acres of cane, of barrels of corn, etc.; that he shall manure the land, or fence it, or ditch it, or otherwise improve it. If Mourlon is correct in stating that a well-conceived public interest requires that the leasing of property be encouraged, and that lessors be so secured that they may protect their property while in the hands of others, then it would be matter for regret if the Louisiana lawgiver had restricted lessors within the extremely narrow limits of the obligations imposed by law upon the lessee. If Mourlon's statement as to public interest is correct, and if, as Aubry and Rau tell us, the object of the lessor's privilege, under the Code Napoleon, is to secure the complete execution of the lease, it would also be matter for regret if the law of Louisiana only afforded the lessor security for a partial and incomplete execution of the lease.

Interveners' counsel presented a view of the matter which may have force. He contended that it is clear that the lessee must enjoy the thing leased according to the use intended by the lease, and that if the lessee makes another use of the thing than that for which it was intended, and loss is thereby sustained by the lessor, the lessee shall be liable for the loss. Civ. Code La. arts. 2710, 2711. It was argued that, if the Ferris Sugar Manufacturing Company had refused to receive the cane of interveners, the refusal would have constituted a violation of the lessees' obligation to use the thing leased as the lease intended, and would have rendered the lessees liable for the damages; i. e. for the value of the cane to the interveners at the time appointed for its delivery. In such a case, the lessees would not have benefited from the cane, and it was urged that the interveners could not possibly be put in a worse position because the lessees received the cane, and benefited from it. After due consideration, I have come to the conclusion that I could not decide the point now under discussion adversely to the interveners without disregarding the decisions of the supreme court of the state and the persuasive authority of the highest French courts and of eminent French commentators.

3. The claim for the loss of part of interveners' crops must be rejected. A party to a contract must endeavor to minimize his loss. His claim for damages will be diminished to the extent to which he could have avoided the loss. Wicker v. Hoppock, 6 Wall. 99; Warren v. Stoddart, 105 U. S. 229; 1 Suth. Dam. (2d Ed.) § 88, and cases there cited. The question of damages involved the examination of a great mass of oral and documentary evidence. The question turns almost entirely on matters of fact. It would answer no useful purpose to go into an analysis of the evidence, but a careful consideration of it left my mind strongly impressed with the belief that, whatever may have been the omissions of contractual duties with which the Ferris Sugar Manufacturing Company may be charged, the interveners could have protected themselves from loss by the exercise of reasonable diligence. It was, of course, for the interveners to first establish the extent of their loss with reasonable certainty, and for them then to

show that the loss occurred through the fault of the Ferris Sugar Manufacturing Company. I find that the losses which the interveners established by sufficient proof, and which might be chargeable to the Ferris Sugar Manufacturing Company, could have been avoided by the interveners had they used the means at their command. A circumstance which bears strongly against the interveners is that the receiver, very soon after his appointment, telegraphed the interveners, offering to grind the cane on certain terms. Had this offer been promptly accepted, the losses would, doubtless, have been materially diminished.

The master has made a full report of the evidence on the question of damages, and has analyzed and discussed it very thoroughly. I agree with him in the conclusion that the claim must be disallowed.