PIERCE, Judge.
This is an appeal by H. Marcus Carman, plaintiff below, from a final decree entered by the Pinellas County Circuit Court in favor of John Harry Gunn, defendant below, denying relief in a specific performance suit. The parties will be referred to as they were in the Court below.
By amended complaint, plaintiff sought the aid of the chancery Court in requiring defendant to specifically perform a written agreement entered into by the parties on June'3, 1964, whereby defendant agreed to sell to plaintiff all his stock in a solely-owned corporation known as True Realty Co., Inc., for the sum of $137.50 cash and a like sum each month thereafter for and during the lifetime of defendant, or for a period of five years from date of the agreement, whichever was longer. It was provided that in the event of defendant’s death within said period, such monthly payments would be then made to Mrs. Reglita V. Reyes, his housekeeper, until the five year period expired on June 3, 1969.
The corporation, hereinafter referred to as True Realty, held title to defendant’s realty holdings, consisting largely of property bordering upon or near the Little Withlacoochee River in Sumter County. The property was the remaining accumulations of defendant from many years of buying and selling property in that area, dating back to acquisition of tax delinquent properties under the old Murphy Act of the latter 1930’s. The corporate entity had been created as a convenience to defendant in dealing in real estate because he was then laboring under disability of an insane wife.
After the agreement of June 3, 1964, plaintiff sent to defendant promptly each month his check for the requisite monthly payment of $137.50. However, defendant refused to either cash or return any of them, including the original check given at the time the agreement was made. Defendant also refused to convey or transfer his stock in the corporation as provided in the agreement.
By answer, the defendant admitted executing the contract, admitted receiving the monthly checks and not cashing any of them, and admitted owning all stock of True Realty and that its main asset was real estate; alleged that on the day the agreement was signed his “physical and mental condition was such that he was incapable of transacting business,” that he had been “suffering from an asthmatic condition,” that “lack of sleep had dulled his mental facilities (sic)” so that he was “not able to comprehend the meaning” or understand the terms of the agreement; that he had just passed his 69th birthday and “has a shortened life expectancy because of his *78 asthmatic condition and other physical infirmities”; and that the agreement contemplated transfer of the stock only “after full payment therefor” and that it would be inequitable to require such transfer prior to full payment “because the defendant would be left without any security for future payments by the plaintiff.”
Thus the issues drawn by the pleadings were extremely narrow, consisting of only two substantial questions, (1) the legality of the agreement from the standpoint of defendant’s competency to execute the same, and (2) the enforceability of the agreement as against the claim that it lacked mutuality of remedy. After trial and taking of sworn testimony, the Chancellor entered final decree on November 22, 1966, finding that the agreement was for the purpose of transferring to plaintiff the entire outstanding stock of True Realty, whose sole asset was title to approximately 275 acres of real property in Sumter County which was free and clear of any encumbrance of record; that the monthly payment checks had been received by defendant but not “negotiated”; that defendant’s physical condition when he executed the agreement was such that he was not unaware of his actions and therefore “knew, or should have known, the contents of said contract”; that the acts and conduct of plaintiff did not “in any way amount to fraud, overreaching, or sharp practices”; that while the agreement was ostensibly for the purchase of corporate stock it was actually an agreement “for the purchase of real property” and viewed thusly “its terms were not sufficiently certain nor could there be a mutuality of remedy thereunder”; and that the agreement was not equitable because of “a complete lack of adequate security for the defendant” and therefore should not be specifically enforced although “the amount of the consideration is not in and of itself inadequate.” The decree thereupon denied specific performance without prejudice to plaintiff pursuing any “action at law” he might have.
We agree with the able Chancellor upon his findings and hold there was credible, substantial evidence to sustain the same, except such findings as bear upon the decretal order denying specific performance, as to which we are impelled to disagree and must reverse.
The testimony reveals a most interesting human interest story. At the time of the agreement, defendant was a retired dentist living in St. Petersburg and had organized the True Realty corporation some thirty years before for the sole purpose of being able to handle real estate transactions over his own signature notwithstanding a then incompetent spouse. He lived alone in a home owned and occupied by his housekeeper Mrs. Reyes, and had been retired only about four years. Although Dr. Gunn stated he was feeling “so bad” physically when the agreement was signed that he in effect didn’t know what he was doing, he displayed in his testimony a remarkable mental alertness and agility which is readily apparent even from the cold record. His memory was acutely sharp and incisive, being able at will to recall dates, persons, locations, geographical descriptions, transactions, occurrences, etc., in trenchant detail, such as would challenge a much younger person of the keenest intellect. He displayed a rare insight into comparable values, relative locations of property, trends of realty developments, and generally all facets of the real estate field. It is apparent that in asserting his inability to comprehend the nature of the agreement when it was signed, he, to use a trite, hackneyed expression, “protesteth too much.”
The negotiations and actual execution of the agreement in question came about in meetings between plaintiff, Dr. Gunn, and one George R. Boortsalas. Boortsalas had known Dr. Gunn for some ’ten or twelve years, first as a dentist, and later through accounting work with a realty company. He had known plaintiff Carman about five or six years as an acquaintance at stockholder’s meetings of a development organization. Prior to June 3, 1964, Dr. Gunn had *79 asked Boortsalas “about selling the property” and Boortsalas “had indicated that Mr. Carman might be interested.” Thereafter, around June 1st, Boortsalas chanced upon Carman and mentioned to him “that Dr. Gunn was interested in selling the property” and' “would he be interested in meeting Dr. Gunn.” Carman indicated that he would, so Boortsalas phoned Dr. Gunn and asked him “would he be interested in meeting with Mr. Carman, and he said yes.” Dr. Gunn “set the time” for the meeting for the following afternoon around 1 or 2 o’clock, at which time Carman and Boortsalas went to Dr. Gunn’s home, where the deal was discussed at length, Boortsalas listening but taking no part otherwise in the conversation. Boortsalas testified that in the early stages of the discussion Dr. Gunn did most of the talking. They then discussed the deal at length.
Boortsalas could not recall that there was “a total price ever mentioned” but that the “first mention of figures” was when Car-man offered “$125.00 a month for life on a longevity basis, and then Dr. Gunn said he wanted one hundred and fifty, would like to have one hundred and fifty.” Later they mutually agreed to “split the difference” and make it $137.50 a month. They then procured writing paper and pen and ink and the agreement was written out in longhand in duplicate. After the first paragraph was written, which merely specified the transfer of stock and the time and amount of monthly payments, Carman, according to Boortsalas’ testimony, “gave it over to Dr. Gunn to read it. Dr. Gunn read it and apparently wasn’t fully satisfied with it, because he asked Mr. Carman to add to it by including in a paragraph giving Mrs. Reyes a five-year guarantee on longevity basis apparently, and Mr. Car-man agreed. He took back the paper and added to it the second paragraph indicating this five-year guarantee. And then he gave it back to Dr. Gunn, and Dr. Gunn read it. And some place in there he handed it to me and said, ‘Do you think this is all right?’ And I said — I also read it and he asked me if it was all right, and I said inasmuch as it seemed -to fulfill the agreement and he was satisified and that’s what they wanted, it was all right; I didn’t see anything wrong with it.”
As stated, two separate copies of the agreement were made out, each of which was written in longhand, each signed by Dr. Gunn and by Mr. Carman and witnessed by Mr. Boortsalas, Dr. Gunn retaining one signed copy and Mr. Carman the other. One of the originals is in the record and shows to be legibly and plainly worded. Boortsalas testified that the parties were together for “two and' a half to three hours,” and when asked about Dr. Gunn’s appearance “from a health standpoint” when they were leaving he stated “he seemed all right. He didn’t seem to have any particular change in appearance or anything. Both of them seemed to be quite satisfied with their arrangement and, their attitude, both seemed to be quite satisfied.” Boortsalas further testified that he had never discussed any terms or price or any figures with Carman concerning the property as he “knew of no figures to discuss,” nor did he have any opinion concerning the value of the property.
The foregoing is the substance of the testimony of Mr. Boortsalas, who was not cross-examined by Dr. Gunn’s counsel. For information, we include in the appendix a picture copy of the original agreement.
Mr. Carman and Dr. Gunn also testified at length. Their testimony is not at variance with that of Boortsalas, except that Dr. Gunn insisted he was not in mental or physical condition to really understand what he was doing. This insistence, as herein-before pointed out, is neutralized by his mental astuteness readily apparent from his full testimony. One further excerpt from Dr. Gunn’s testimony of significance is when he was narrating the planning and preparation for the conference visit of Mr. Carman when he told of rising early, *80 “about five I started cleaning up and I got cleaned up too quick. We (apparently he and Mrs. Reyes) went out in the backyard waiting, it was so devilish hot. Finally they came. George wanted to get a table arid use it for some papers. All I had was some note paper. I didn’t have any paper to write on except that. So I got it for him and we looked over that map.” The map was an unusually large handwritten drawing to scale by Dr. Gunn showing all property holdings and owners thereof in that Little Withlacoochee River area.
We have gone into somewhat redundant detail in reviewing the testimony showing the circumstances under which the agreement was made and executed, the relationship of the parties, and the general atmosphere at the time and place of the agreement, in view of the natural and normal tendency to look askance and with a critical eye at any agreement so drawn. Suffice further to say that the findings of the Chancellor in this regard finds abundant support in the record, especially when fortified by the well-weighted circumstance that the Chancellor personally heard and observed all the witnesses at the trial, including Dr. Gunn.
On the remaining question, however, we find error in that portion of the Final Decree denying specific performance to plaintiff Carman. The Chancellor found that the agreement did “not in any way amount to fraud, overreaching, or sharp practices” and that “the amount of the consideration is not in and of itself inadequate” but that nevertheless the contract was “not fair and equitable” in that there was “a complete lack of adequate security for the defendant,” presumably in assuring continuance of the monthly payments. If such would be the necessary consequence of specific performance decreed to Carman, we would have no hesitancy in upholding the Chancellor. But we do not agree that Dr. Gunn should or would be “left holding the bag,” or more literally, holding a unilateral paper contract which had already been performed on his part.
The parties were already in a chancery court, with all its broad historic power to do right and justice and provide remedies. Plaintiff Carman himself had tendered the subject matter of the controversy into the keeping of a Court of Equity, thereby subjecting himself to the broad reaches of equity jurisdiction the same as he was seeking it against Dr. Gunn. And from the facts before the Court, we would be unwilling to say that equity was powerless to protect Dr. Gunn, having first found and decreed that the agreement was otherwise valid.
Parenthetically, we can dispose of one minor phase of the case at this point. Both parties make respective contentions as to the subject matter of the sale being personalty in the form of corporate stock rather than a contract for the sale of real estate, even though the main asset of the corporation consisted of realty; and also the derivative fact that the contract made no attempt to legally describe the real property. We hold this is a “distinction without a difference” under Harbeson v. Jackson Land Company, Fla.App.1962, 143 So.2d 727. In that case the Harbesons had contracted with Jackson Land Company, a corporation, to sell a certain Pensacola Hotel property, the form of the transaction being the agreement of Jackson Land to purchase from the Harbesons controlling shares of the capital stock of the Pensacola Hotel Company, a Florida corporation. Upon default of Jackson Land in carrying out its contract to purchase, the Harbesons brought suit for specific performance. The Supreme Court held that -
“* * * |jlj]t is well settled in this jurisdiction that a suit for specific performance will lie under appropriate circumstances for enforcement of a contract for the sale and purchase of stock in a closely-held corporation. The landmark case establishing this rule is Baruch *81 v. W. B. Haggerty, Inc.” (Cited as Fla.1939, 188 So. 797.[1])
In fact, in Harbeson the purchaser, Jackson Land Company, conceded that specific performance would lie under ordinary circumstances, hut that strict performance should not be decreed because the contract there involved expressly provided remedy for the breach by the return to the sellers of all stock by the escrow agent, by whom it had been held pending full completion of the purchase agreement. Jackson Land contended that “the situation is comparable to that of a seller under a conditional sales contract who has repossessed itself of the property covered by the contract.” But the Court did not agree, holding that merely because the contract in question provided its own remedy for default, the sellers were not restricted to such remedy but could insist, by suit for specific performance, upon full compliance by the purchaser upon the ground, among others, that “the purchaser unqualifiedly agreed to purchase.” Har-beson cites as upholding this latter principle, the Supreme Court cases of Chace v. Johnson, 1929, 98 Fla. 118, 123 So. 519, and Chace v. Smith, 1931, 102 Fla. 1013, 136 So. 672. This proposition of the contract containing its own express remedy for default is not present in the instant case, but it shows the extent to which the Supreme Court has committed itself on the broader principle of corporate stock being subject to specific performance, even though it indirectly affects only real estate.
Proceeding to the crux of the case sub judice, mutuality of remedy, the case of Vance v. Roberts, Fla.1928, 118 So. 205, is cited here by both parties. In Vance there was a written agreement whereby Roberts, the owner, agreed to sell certain real estate to Vance, the purchaser, for a total purchase price of $10,815.00, payable $500.00 cash deposit, the sum of $2,204.00 on delivery of warranty deed and clear title, and the balance in three subsequent annual installments of $2,704.00 each, payable one year, two years and three years from date of deed. The contract provided that in the event of default on the part of purchaser to make any of the payments called for “this contract shall be forfeited and terminated” and all previous payments retained by the sellers “in full satisfaction and liquidation of all damages by them sustained” and they would “have the right to re-enter and take possession of the premises.”
Subsequent to the execution of the sales agreement the sellers tendered an abstract of title which showed a mortgage encumbrance as well as “some irregularities in some of the conveyances.” On several occasions the buyers communicated to the sellers their desire to go through with the purchase, on each of which occasions the seller replied that “the title to the lands would be perfected, that the mortgage indebtedness would be discharged and that a warranty deed, conveying the title to the lands, would be executed and delivered” by the owner to the purchaser. Thereafter however, the buyer received from the owner a check for $500.00, constituting return of the cash deposit, together with a communication advising that the owner was not going through with the sale. The buyer then tendered to the owner the sum of $2,204.00 (the amount the contract required to be paid on closing of the deal), and demanded execution and delivery by the owner of the deed provided for in the agreement.[2]
The owner still refusing to convey or otherwise live up to the agreement, the buyer filed suit, seeking ■ specific performance of the sales agreement. The owner sought dismissal of the complaint upon the *82 main ground that the parties were “not mutually bound by the covenants and conditions of the -contract” which contention the trial Court sustained. Upon appeal, the Supreme Court reversed, holding that the limitation of remedy in the agreement was not exclusive, and also that the contract was not otherwise lacking in mutuality of remedy, observing that “the fact that the agreement in question confines the vendor’s remedy against the purchaser to the recovery of liquidated damages * * * does not alter the fact that the contract is, on the owner’s part, a promise to sell, and, on the purchaser’s part, a promise to purchase. An agreement in a contract, specifying and limiting the particular remedy available to a party to the contract upon the breach thereof by the other, does not change the respective mutual promises which constitute the substance of the contract.” The opinion of the Supreme Court proceeds as follows (text 118 So. 207-208) :
“Viewed as a contract for the .sale of the lands involved, do its terms disclose (1) such want of mutuality of obligation that equity will decline to recognize and .enforce it as a binding contract; or (2) such want of mutuality of remedy, available to each of the respective parties upon a breach by the other, that equity will not enforce specific performance against the vendor because such remedy would not be available to the vendor upon a breach by the purchaser?
“We do not think that there is any lack of mutuality of obligation, even if the legal effect of the terms of the agreement is as counsel for the appellees argues that it is, merely because of the fact that the purchaser may have satisfied all obligations of the contract upon his part by forfeiture of the amount paid upon the purchase price. His very obligation to forfeit this sum is a sufficient consideration to support the promise made by the appellee owner and his wife to convey. Clearly this is sufficient mutuality of obligation.
“The question of want of mutuality of remedies, as affecting appellant’s right to enforce specific performance of the contract, is one, at first thought, of seeming difficulty, in view of the fact, if the construction placed upon the terms of the contract by counsel for the appel-lees is correct, that the owner’s remedy for a breach on the part of the purchaser is limited to liquidated damages, measured by the amount paid upon the purchase price.
Jfc i}C >fc 5j< ‡ ‡
“It is readily apparent that the appellee owner in this controversy will not be left, if specific performance is decreed, to seek any remedy in any forum other than the court of equity in which this suit was instituted. Indeed, in view of the appellant’s tender, which has at all times been kept good, so it is alleged in the appellant’s bill, the appellee owner will not require any remedy at law or in equity to enforce his rights.
“We are of the opinion that, at the time of the commencement of this suit, and since then, by reason of the appellant’s tender, the defense of want of mutuality of remedies is not available to the appellees. The appellees are in such a situation that they need no remedy, except that the appellant’s tender be kept good and that he be required to pay the required portion of the purchase price of the involved lands at the time of the conveyance of the lands to him, which can, of course, be provided for in the decree of the court. Black v. Maddox, 104 Ga. 157, 30 S.E. 723; Wright v. Suydam, 72 Wash. 587, 131 P. 239; Le Noir v. McDaniel, 80 Fla. 500, 86 So. 435; Pomeroy’s Specific Performance of Contracts (3d Ed.) § 162 et seq.” (Emphasis supplied).
The Supreme Court reversed in Vance v. Roberts and in effect directed that a decree of specific performance be entered on the broad buy-and-sell aspects of the agreement, even though at the time of suit there *83 had been a monetary tender of only one-fourth of the total purchase price provided in the contract. Such is strictly analogous to the situation in the instant suit, where the down payment and monthly payments of $137.50 are the equivalent of the cash deposit and monetary payment at the time of closing of the deal involved in Vance v. Roberts. It will, of course, be particularly noted that in that case the Supreme Court held that protection of the owner in requiring the purchaser to “pay the required portion of the purchase price * * at the time of the * * * conveyance” could "be provided for in the decreeThe same thing can be said of the instant case.
The cases of Jones v. Carpenter, 1925, 90 Fla. 407, 106 So. 127, 43 A.L.R. 1409; Phelps v. Higgins, Fla.App.1960, 120 So.2d 633; Tucker v. Prevatt Builders, Inc., Fla. App.1959, 116 So.2d 437, and Atlantic Federal Savings and Loan Association v. Kitimat Corporation, Fla. App. 1962, 143 So.2d 719, are all authority for the general proposition that an equitable lien may be “declared by an equity court” and impressed upon the property in litigation “out of general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealings in the particular case.” The opinion of Mr. Justice Terrell in Jones v. Carpenter, supra, described by this Court in Atlantic Federal Savings as “the leading case” on the subject, contains an exhaustive treatment of the point here involved and we quote therefrom as follows (text 106 So. 128, 129) :
“ * * * the doctrine of equitable liens would never have come into existence if it were true that one who claims such a lien must first show a lien at law. Equitable liens become necessary on account of the absence of similar remedies at law. Burdon Central Sugar Refining Co. v. Ferris Sugar Mfg. Co., et al. (C.C.) 78 F. 417, 421.
“ * * * [T]he doctrine of equitable liens is one of great importance and of wide application in administering the rights and remedies peculiar to equity jurisprudence. There is perhaps no doctrine which more strikingly shows the difference between the legal and the equitable conceptions of the juridical results which flow from the dealings of men with each other, from their express or implied undertakings.
“An equitable lien is not an estate or property in the thing itself nor a right to recover the thing; that is, a right which may be the basis of a possessory action. It is neither a jus ad rem nor a jus in re. It is simply a right of a special nature over the thing, which constitutes a charge or incumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action, and either sold or sequestered under a judicial decree, and its proceeds in the one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists. It is the very essence of this condition that while the lien continues the possession of the thing remains with the debtor or the person who holds the proprietary interest subject to the incum-brance. Pomeroy’s Equity Jurisprudence (4th Ed.) vol. 3, p. 2958.
“* * * ‘[Ejquitable liens’ were defined as such as arise either from a written contract which shows an intention to charge some particular property with a debt or obligation or declared by a court of equity from the facts and circumstances of the case and do not depend on possession. They are more properly a charge on the thing which can be enforced only in equity.
“ * * * [Tjhe doctrine of equitable lien follows the doctrine of subrogation. They both come under the maxim, ‘Equality is equity,’ and are applied only in cases where the law fails to give relief and justice would suffer without them. The doctrine of equitable lien is not a limitless remedy to be applied according to the measure of the con *84 science of the particular chancellor anymore than, as an illustrious law-writer said, to the measure of his foot.
j{: ‡ >{: >fc ‡
“The equitable lien differs essentially from a common-law lien; the latter being- mere right to retain possession of some chattel until a debt or demand due the person thus retaining it is satisfied; possession being such a necessary element that it is voluntarily surrendered by the creditor the lien is at once extinguished, while in the former or equitable lien possession remains with the debtor or person who holds the proprietary interest. Jones on Liens (3d Ed.) vol. 1, 26; Pomeroy’s Equity Jurisprudence (4th Ed.) vol. 3, 2958; 17 R.C.L. 605.
“From the foregoing it is seen that equitable liens arise from two sources, viz.: (1) A written contract which shows an intention to charge some particular property with a debt or obligation; (2) is declared by a court of equity out of general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealings in the particular case. Jones on Liens, supra; 17 R.C.L. 605, supra; 25 Cyc. 667. Equitable liens are necessarily based on the doctrine of estoppel and usually arise in cases of expenditures by one joint owner on real or other property or in cases where a party innocently and in good faith makes improvements on the property of another. These last two, however, are by no means the only instances in which they may arise." (Emphasis supplied).
Equitable liens have become an established part of Florida jurisprudence. See Armstrong v. Blackadar, Fla.App. 1960, 118 So.2d 854; Union Trust Company of St. Petersburg v. Wittmann, Fla.App.1962, 145 So.2d 540; Richard Bertram & Co. v. Barrett, Fla.App.1963, 155 So.2d 409; Phelps v. T. O. Mahaffey, Inc., Fla.App.1963, 156 So.2d 900; Frank v. Groo, Fla.App.1965, 176 So.2d 119. See also the excellent legal rationale of Gulf Shore Dredging Company v. Ingram, Fla.App.1966, 193 So.2d 232, concerning equitable liens.
We perceive no reason why the trial Court in the case sub judice could not decree specific performance in behalf of plaintiff Carman and in the same decree impress an equitable lien upon the stock of True Realty and also, if necessary, upon the real estate held in the name of True Realty, for the full payment by Carman of all sums due Dr. Gunn under the agreement between them, and retaining jurisdiction of the cause until such full payment is made. In this situation, the Court could thereafter make such orders or decrees in the matter as, from time to time, should be necessary or advisable to do right and justice as between the parties to the cause, their “heirs, executors and assigns.”
This disposition of the case should do full justice to both parties for the reason that, notwithstanding Dr. Gunn contended he could not “comprehend” what he was signing, it is significant that although he was already in a Chancery Court he took no steps at any stage of the proceeding to attempt any cancellation of the agreement, giving rise to the reasonable assumption that his only concern was to be assured of getting full payment under the contract. While the Chancellor in his findings would have made a decree of cancellation difficult, if not impossible, neither Dr. Gunn nor his counsel could have known in advance what findings the Chancellor would ultimately make. Also, if the issues had also embraced cancellation, the scope of testimony might have been considerably beyond that which the issues actually being tried would permit.
Accordingly, the decree appealed from is reversed, with directions that further proceedings be had in the trial Court consistent with the views herein expressed.
Reversed and remanded.
LILES, Acting C. J., and HOBSON, J., concur.
*85 APPENDIX

. Also cited in support is the Supreme Court Case of McCutcheon v. National Acceptance Corporation, 1940, 143 Fla. 663, 197 So. 475, 130 A.L.R. 915, and the 3rd District Court case of Rosenberg v. Novack, Fla.App.1959, 112 So.2d 60.

. It will be noted that apparently the buyer was willing to take title eyen with the title encumbered by an existing mortgage and the other “irregularities.” .