In re ABRASS, Barbara Joan, Debtor.

White, Douglas Charles, Plaintiff,

v.

Weatherford, Trustee, Laurie K.
Abrass, Barbara Joan Graham,
James, Defendants.

Bankruptcy No. 99–09101–6J3.
Adversary No. 00–00258.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Sept. 28, 2001.

Laurie K. Weatherford, Winter Park, FL, Chapter 13 Trustee.

Richard B. Webber, II, Orlando, FL, for Plaintiff.

Sean D. Concannon, Orlando, FL, for Defendant.

*FINDINGS OF FACT AND CONCLU-SIONS OF LAW GRANTING PLAINTIFF'S MOTION FOR RE-LIEF FROM STAY AND TRIAL IN ADVERSARY PROCEEDING 00-00258*

KAREN S. JENNEMANN, Bankruptcy Judge.

The debtor, Barbara Abrass (the "Debtor"), is an experienced real estate agent specializing in commercial transactions during the majority of her career. The issues addressed in this order involve the Debtor's actions in connection with one particular real estate deal that went amiss.

Evidence was taken in a bifurcated manner. After several days of evidence, on January 30, 2001, the Court rendered a partial oral ruling finding that the Debtor had committed actual fraud in the pertinent real estate transaction and was liable to Douglas Charles White ("White") and a related company, Planbridge Properties, Ltd. ("Planbridge") for damages of $179,500. As a result of this ruling, on February 2, 2001, an order was entered overruling the Debtor's objection to Claim 11 filed jointly by White and Planbridge and allowing them an unsecured, non-pri-ority claim for $179,500. The Debtor timely filed an appeal of this order.

Later, on March 7, 14, and 21, 2001, additional evidence was taken on the two matters now at issue. The evidence is cumulative, and, in rendering this ruling, the Court has considered the evidence initially offered as well as the more recent testimony. The first matter currently under consideration is a Motion for Relief from Stay (the "Motion") (Doc. No. 129) filed by White individually, and as Director of Planbridge, against the Debtor. In the Motion, White seeks relief from the automatic stay to file a complaint against the Debtor with the real estate division of Florida's Department of Business and Professional Regulation, the Florida Real Estate Commission ("FREC"). White alleges that the Debtor fraudulently acquired her home using $179,500 of his and Planbridge's money and seeks to recover at least a portion of these funds from Florida's Real Estate Recovery Fund (the "Fund"). *See* Fla. Stat. § 475.482 (2000).

The second matter under consideration are the issues raised in White's Complaint to Determine the Extent, Validity, and Priority of Liens, to Avoid Fraudulent Transfers, and to Impose an Equitable Lien (the "Complaint") (Doc. No. 1) filed in Adversary Proceeding 00-0258 against the Debtor, James Graham ("Graham"), a mortgagee holding a mortgage encumbering the Debtor's home, and Laurie K. Weatherford, the Chapter 13 Trustee (the "Trustee"). The Debtor, acting *pro se*, filed an Amended Answer (Doc. No. 6) denying the allegations. The Trustee also filed an Answer (Doc. No. 10) to the Complaint as well as a counterclaim against White and cross claims against the Debtor and Graham.

In the Complaint, White asks the Court to determine the validity and priority of

liens asserted by White and the Trustee against the Debtor's homestead. White alleges that he is entitled to a constructive trust[1] or an equitable lien against the Debtor's home because the home was purchased with funds the Debtor fraudulently obtained from Planbridge. The Trustee alleges that the estate, not White, is entitled to impose a constructive trust upon the Debtor's home pursuant to Bankruptcy Code Sections 11 U.S.C. 105, 544(a)(1), and 544(a)(2), and that any lien White may have is inferior to the Trustee's lien as an avoidable unrecorded interest in real property under 11 U.S.C. § 544(a)(3)[2] and Florida Statute § 695.01. The Debtor contests all of these allegations. Mr. Graham chose not to oppose the Complaint, and his claims will be discussed in more detail later in this opinion.

In order to make sense of these competing claims, a detailed description of the real estate transaction giving rise to White's fraud claim is necessary. The Debtor has worked in real estate sales for approximately thirty years, specializing in commercial sales. In August, 1993, the Debtor owned a fifty percent interest in a company called Tricor Multi Family, Inc. ("Tricor").[3] The Debtor acted as Tricor's president and broker of record, and Marc Hagle ("Hagle"), the financial investor,

acted as Tricor's vice president. (Tricor's Exhibit No. 5). The Debtor was prohibited from working for any competing entity while employed with Tricor.

Tricor paid the Debtor a monthly advance of $3,900 during the first year of employment, with the understanding that the Debtor would repay Tricor from commissions she earned. Because Hagle provided all of the funding for Tricor, he personally funded the Debtor's monthly salary advances and all of Tricor's expenses, not only for the first year, but for several additional years. Apparently, Hagle continued to fund the unprofitable Tricor and the Debtor individually because the Debtor continually indicated that she was close to completing some lucrative real estate transaction that would generate substantial income for Tricor. Hagle also may have continued to fund the Debtor's salary advances because the Debtor and Hagle had a very close personal relationship. The exact nature and extent of their personal relationship is uncertain. The Debtor reimbursed Tricor for few, if any, of her salary advancements.[4]

In mid–1997, the Debtor met a businessman who lived in the United Kingdom named Robert Tringham ("Tringham"). Tringham played a lead role in all the

1. White formally asked only for an equitable lien in the Complaint. However, on February 27, 2001, White filed a Memorandum of Law (Doc. No. 40) in which he asserted he was entitled to *both* a constructive trust and an equitable lien. The Court finds that all parties knew of White's alternative request for a constructive trust. Pursuant to Bankruptcy Rule 7015, the parties impliedly consented to the additional request for a constructive trust and presented evidence on the request. No party objected to the evidence or White's additional request. Therefore, the Court will treat White's request for a constructive trust as an amended plea necessary to conform the pleadings to the evidence.

2. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

3. Tricor Multi Family, Inc. later changed its name to Tricor Service Corporation. (Tricor's Exhibit No. 17).

4. Tricor filed claim number 10 in this case seeking reimbursement of $114,000 from the Debtor asserting a breach of contract and fraud by the Debtor. The Debtor has objected to Tricor's claim (Doc. No. 225). Because the matters addressed in this order may affect the resolution of the Debtor's objection to Tricor's claim, a hearing on that dispute was deferred pending the entry of this order.

actions to follow. In October and November, 1997, the Debtor traveled to the United Kingdom to meet Tringham; the two became romantically involved. The Debtor soon introduced Tringham to Hagle with the hope that the two men may join in a business venture. The testimony was unclear as to the extent of any such joint business ventures between Hagle and Tringham. However, on November 7, 2000, Hagle did obtain a default judgment exceeding $32 million against Tringham. (Tricor Exhibit No. 3). The testimony was clear that the Debtor's relationship with Tringham led to the collapse of Tricor. The Debtor and Hagle had a major disagreement in late 1997, perhaps due to the Debtor's romantic involvement with Tringham, the Debtor's failure to close even one transaction in Tricor's name, or to Hagle's discontent on continually advancing significant sums of money to the Debtor with no economic return. After several public disputes, the Debtor resigned from Tricor in January, 1998. The relationship between the Debtor and Hagle dissolved into one of vindictiveness and mutual animosity.[5]

Prior to the Debtor's resignation from Tricor, Tringham offered to assist the Debtor in her real estate business, particularly the transaction at issue here. The Debtor told Tringham about one of her clients, the Moukhtara Trading Company ("Moukhtara"). Moukhtara owned a large parcel of undeveloped property located in a rapidly developing tourist corridor at 535 Lake Bryan, Lake Buena Vista, Florida (the "Lake Bryan Property"). The Debtor acted as Moukhtara's broker to sell the property while she was employed by Tricor. She worked with Florida Architects, Inc. ("FAI"), and particularly Mr. Sorci, to develop preliminary plans that contemplated building luxury rental condominiums on the land. The preliminary concepts were prepared to entice prospective investors to purchase and to develop the property. The Debtor told Tringham that a developer could make a substantial profit if the condominiums were built and sold to consumers. Tringham was intrigued.

The Debtor and Tringham thereafter collaborated on a plan to use FAI's architectural and engineering schematics for the Lake Bryan Property to lure investors to act as middlemen with the hope of making a tidy profit. (Tricor Ex. No. 24). To further their efforts, in March, 1998, the Debtor formed Barbara J. Abrass, Inc. and opened a new office. (Tricor Exhibit No. 25). At around the same time and using the same accountant as the Debtor, Tringham formed Tringham and Associates, Inc. ("Associates") and Pinnacle Properties Development, Inc. ("Pinnacle"). The Debtor and Tringham thought one of these corporate entities would sign a contract to purchase the Lake Bryan Property from Moukhtara and then, in turn, assign Associates/Pinnacle's interest to the ultimate investors and developers. The advantage of this part of the scheme was that the actual investors never dealt directly with the sellers, Moukhtara. Rather, the Debtor and Tringham served as the exclusive communication conduit between the investors and the sellers. As will be explained below, the Debtor and Tringham took full advantage of this opportunity.

During April and May, 1998, the Debtor and Tringham perfected their plan. Tringham, through his lawyer, Chris Stanley, negotiated with Moukhtara's attorney, John Haytor. On May 12, 1998, the Debtor wrote Moukhtara and identified herself in a new role as the transactional broker representing *both* Moukhtara and Tringham's company, the Associates. (Tricor's

---

**5.** Hagle's testimony reeked of palpable hostility between Hagle and the Debtor and was not credible. The Court gives Hagle's testimony very little weight.

Exhibit No. 29). She declared that she no longer acted exclusively as the sales broker for Moukhtara. The Debtor's letter told the sellers that the Associates wanted to purchase the Lake Bryan Property and then assign the purchase contract to a corporation that was forming in the United Kingdom.[6] The letter, which was written on the Debtor's new letterhead and not on Tricor letterhead, also indicated that the Debtor would receive a commission of 4% of the expected $5,250,000 sales price. At this point, the sellers reasonably believed that the Debtor, their broker, had procured a legitimate, financially solvent buyer who would assign its interest to a group of equally solvent British investors. The letter also confirms the Debtor's knowledge of Tringham's efforts to locate British investors. The Debtor knew of, monitored, and assisted Tringham in his efforts to find and sway these investors to pursue the purchase of the Lake Bryan Property.

At some point in late May, 1998, Tringham met with White and White's attorney, Nick Rowles Davies ("Davies"), in England. Mr. White, a citizen of the United Kingdom, has some experience in real estate development. Two additional gentlemen, John Haley Payne ("Payne") and Richard Harper ("Harper"), also attended this first meeting. Tringham informed the group about his plans for the Lake Bryan Property and represented that the project would require an initial investment of £150,000 sterling, equaling approximately $240,000. Of this amount, Tringham indicated that, from these funds, $10,000 would be paid as a deposit on the contract with Moukhtara as consideration for a six-ty-day inspection period and $230,000 would be used to pay for legal fees and additional engineering and site work by FAI.

The group agreed to incorporate as Planbridge and to invest in the Lake Bryan Property. White held a 50 percent interest in Planbridge, Harper and Payne both held 12 percent interests, Tringham held a 25 percent interest, and Davies held a *de minimus* one percent interest. Tringham, White, Harper, and Payne constituted Planbridge's initial board of directors. Tringham personally guaranteed the repayment of Planbridge's investment. (White's Exhibit No. 15).[7]

At the conclusion of the meeting, Tringham agreed to move the transaction along upon his return to the United States. Planbridge's directors agreed that Tringham's company, Associates, would serve as the purchasing entity of the Lake Bryan Property using Planbridge's seed money and that Associates then would assign the purchase contract to Planbridge. Consistent with this agreement, Tringham provided a draft contract (the "Contract") for the purchase and sale of the property between Moukhtara and Associates and a copy of the assignment agreement (the "Original Assignment") to be executed between Associates and Planbridge. (White's Exhibit No. 18). The terms of the Original Assignment and the specific understanding of the Planbridge investors was that Tringham would use Planbridge's $240,000 initial investment for soft development costs, such as FAI's architect and engineering fees, related attorney's fees,

---

6. The letter also identified Tringham as an English chartered accountant who practiced in London. Tringham is not a chartered accountant and has never practiced in the accounting field.

7. The Planbridge investors, other than Tringham, later transferred any interest in Tringham's guarantees to Mr. White individually. (White's Exhibit No. 16). Therefore, White individually is legally entitled to pursue his own as well as Planbridge's claims against Tringham and the Debtor.

and payment of $10,000 to Moukhtara for the sixty-day inspection period.

In reliance upon the Original Assignment and Tringham's promises, on May 28, 1998, Planbridge gathered the funds and transferred approximately $240,000 to Stanley, Tringham's attorney. (Tricor's Exhibit No. 30). Of those funds, $10,000 appropriately was used as a deposit on the contract with Moukhtara, $20,000 was retained by Stanley for his legal fees, and somewhere between $15,000 and $25,000 was transferred to Tringham's individual bank account and disappeared. The balance of the funds directly funded the purchase of the Debtor's current home.

Tringham directed Stanley to wire $179,500 of Planbridge's money to SunTrust Bank[8] in Winter Park, Florida. This money then was used by the Debtor to purchase her home at 702 Lake Worth Circle, Heathrow, Florida.[9] Thus, other than the $10,000 deposit on the Contract for the sixty-day inspection period and possibly $20,000 in Stanley's legal fees, none of Planbridge's money went to the development of the Lake Bryan Property. Rather, unbeknownst and unapproved by Planbridge's directors, at least $179,500 of Planbridge's money was directly and fraudulently diverted and used to buy the Debtor's home.[10] White has traced the use of Planbridge's monies into the Debtor's home.

Only after the purchase of the Debtor's house, on June 2, 1998, did Tringham execute the Contract for Associates' purchase of the Lake Bryan Property with Moukhtara for a purchase price of $5,250,000.

(White's Exhibit No. 17). The Debtor was listed as the broker acting on behalf of Tricor, not her newly formed company. To further Tringham and the Debtor's fraudulent scheme, however, instead of executing the Original Assignment (White's Exhibit No. 18), Tringham created a *new* assignment agreement (the "Fraudulent Assignment"). (White's Exhibit No. 17).

In this Fraudulent Assignment, which was substituted for the Original Assignment, Planbridge investors allegedly agreed that, unlike the Original Assignment which contemplated that Planbridge's investment would fund the project's soft development costs, the Fraudulent Assignment provided Tringham could keep Planbridge's entire $240,000 investment as his fee. Tringham executed the Fraudulent Assignment on behalf of the Associates *and* on behalf of Planbridge. None of the other members of Planbridge were aware that Tringham had substituted the Fraudulent Assignment for the Original Assignment. None of the other members agreed to the terms of the Fraudulent Assignment. Indeed, none of the Planbridge investors even saw the Fraudulent Assignment until after the Debtor filed this bankruptcy case.

The Debtor knew of the Fraudulent Assignment at or about the time she bought her home. She was simultaneously the broker for the seller and for Associates. She held a close personal and confidential relationship with Tringham, the mastermind behind the scheme. Most tellingly, she personally witnessed the execution of

---

8. Account No. 607000700228753.

9. The home is more particularly described as Lot 28, Lakeside, according to the Plat thereof as recorded in Plat Book 47, pages 68 through 73, inclusive, public records of Seminole County, Florida.

10. The Debtor had signed a contract to purchase the house almost five months earlier, on January 4, 1998. (Debtor's Exhibit No. 3G.) (White's Exhibit No. 56). The closing was timed to coincide with Planbridge's cash infusion.

the Contract which attached the Fraudulent Assignment. The extent of the Debtor's knowledge is further demonstrated by a letter she received from Mr. Sorci at FAI dated May 29, 1998. (Tricor Ex. No. 31.) This letter, sent to the Debtor in her capacity as broker of the Lake Bryan Property, enclosed a proposed contract from Florida Architects requesting a fee of $200,000 for additional engineering and site development work. The letter identified the purchaser as Planbridge, not Associates. The letter illustrates that the Debtor knew of Planbridge's status as purchaser of the Lake Bryan Property and that FAI needed approximately $200,000 to continue its work. Thus, less than one week after Planbridge's funds were depleted, in large part by the purchase of the Debtor's home, Tringham executed and the Debtor witnessed the Contract including the attached Fraudulent Assignment. The Debtor knew the funds should have paid FAI's fees, but did not. Tringham, with full knowledge and cooperation of the Debtor, simply stole the money from Planbridge's investors.

The Debtor and Tringham next orchestrated an extensive series of events to prevent the Planbridge investors from learning about the misuse of these monies. On July 13, 1998, the Debtor and Tringham jointly met with the members of Planbridge in the United Kingdom. At the meeting, the Debtor was introduced as a real estate specialist, *not* as the transactional broker representing both the buyer and the seller in the Lake Bryan Property transaction who would receive a commission on the sale. The Debtor, Tringham, and the other Planbridge directors attending the meeting discussed the status of the sale and a possible encroachment problem affecting the Lake Bryan Property. Equity Residential Property Realty ("Equity"), coincidentally another long-term client of the Debtor, owned the property next to the Lake Bryan Property and, for several years, had used a number of feet of the Lake Bryan Property for its own purposes. The Debtor never disclosed that Equity was one of her clients. Nor did the Debtor disclose her intimate relationship with Tringham. Rather, Planbridge agreed to pay the Debtor an additional $20,000 to resolve the encroachment issue. Planbridge's investors believed the deal was still on track, largely due to assurances they received from the Debtor and Tringham.

Tringham correctly informed Planbridge investors that $10,000 of its $240,000 investment was paid as a deposit to Moukhtara, and that $20,000 in attorney's fees was paid to Stanley. Tringham did not disclose that the balance of Planbridge's funds was used several weeks earlier to buy the Debtor a house and for his personal needs. The Debtor expressly agreed to provide the Planbridge directors with an accounting of Planbridge's remaining $210,000. No accounting was ever provided.

On July 16 or 17, 1998, another meeting took place in the United Kingdom between White, Tringham, the Debtor, and Davies. At this point, White was worried that the sixty-day inspection period would expire before Tringham found an ultimate developer for the property. If the inspection period expired prior to finding a developer-purchaser, Planbridge would forfeit its investment or have to come up with significant additional funding. Tringham assured White that he was in contact with interested buyers, and that he would obtain an extension of time if needed. The Debtor was present at this meeting and assisted Tringham in allaying White's concerns.

Ultimately, Tringham did obtain an extension of time for the inspection period

from Moukhtara. However, Tringham did not seek the extension in Planbridge's name. Rather, Tringham sought the extension on behalf of Associates. By executing the Fraudulent Assignment and seeking the extension in Associates' name, Tringham ensured that all correspondence from Moukhtara would go either to him directly, to his attorney, Stanley, or to the Debtor, and not to any of the other Planbridge directors. The sellers did not yet know of Planbridge's existence. Tringham made no known efforts to find a solvent developer for the project. He, with the Debtor's help, was buying time to delay Planbridge's discovery of the fraud.

By August, 1998, the Planbridge directors were becoming more and more concerned and demanded an accounting and a report to determine the exact status of the Lake Bryan sale. Davies wrote Tringham two letters, one on August 28, 1998, and one on September 8, 1998 (White's Exhibit Nos. 29 & 30), inquiring about the status of Planbridge's funds and whether Tringham found a buyer for the Lake Bryan Property. The Planbridge investors were fearful that the inspection period would expire before they found a purchaser for the property and that they would lose their investment.

The investors' fears were soon realized. On September 11, 1998, Moukhtara's attorney, John Hayter, wrote Stanley and informed him that the Contract was in default for failure to pay the total earnest monies due on the Contract by September 2, 1998. (White's Exhibit No. 31). The Debtor and Tringham both received copies of this letter. However, *no* Planbridge director other than Tringham was notified of the expiration of the inspection period under the Contract.

On October 27, 1998, the Planbridge directors wrote a third letter to Stanley. (Tricor's Exhibit No. 36). The directors demanded details regarding the payments made from their $240,000 investment and a status report from the Debtor regarding the encroachment. The letter also mentions that the directors suspected Tringham of embezzlement. The Planbridge directors still were unaware that the Contract with Moukhtara already had terminated over one month earlier. The very next day, October 28, 1998, the Debtor wrote Tringham a letter in which she attempted to withdraw from all of her roles on the Lake Bryan project. (Tricor's Exhibit No. 37).

Ultimately, the Debtor and Tringham ended their relationship. During the course of her relationship with Tringham, the Debtor was directly involved with the fraud masterminded by Tringham. The Debtor, with full knowledge of the intended purposes and true ownership of the funds, knowingly and actively participated in the scheme to divert approximately $210,000 intended to be invested by Planbridge in the Lake Bryan project. The Debtor possessed the actual fraudulent intent to permanently deprive the true owners of the money. Moreover, the Debtor directly benefited from this fraudulent scheme because she personally received $179,500 of Planbridge's funds and used the money to purchase her home. Planbridge's funds were traced directly to the purchase of the Debtor's home.

Meanwhile, the Debtor's new real estate company still generated no income. The Debtor now turned to another victim for money, James Graham. Initially, Graham loaned the Debtor $50,000 and received a mortgage encumbering the Debtor's home to guarantee the repayment of the loan. Graham properly recorded this mortgage in the public records of Seminole County, Florida.

A few months later, on June 12, 1999, Graham loaned the Debtor an additional

$75,000. Graham and the Debtor executed a Mortgage Modification Agreement that provided that the existing mortgage would secure both the original loan for $50,000 and the additional loan for $75,000. This time, Graham improperly recorded the Mortgage Modification Agreement in Orange County, not Seminole County, on July 14, 1999. When the Debtor spent all the monies advanced by Graham, on November 2, 1999, the Debtor filed this chapter 13 bankruptcy case.

After the bankruptcy was filed, the Trustee filed an adversary proceeding against the Debtor and Graham, adversary proceeding number 00–54, challenging the validity and priority of the Mortgage Modification Agreement because it was filed in the wrong county on the date this bankruptcy was filed and, therefore, was not a valid secured claim. On November 22, 2000, a final order was entered upholding the Trustee's position and finding that Graham had only an unsecured claim for $75,000 arising from the Mortgage Modification Agreement but that the Trustee could preserve the benefit of that agreement for the creditors of this bankruptcy estate pursuant to § 551(a) of the Bankruptcy Code (Doc. Nos. 22 and 23 in Adv. Pro. 00–54). The order further provided that the Trustee's interest was inferior, however, to the initial $50,000 loan and related mortgage properly recorded by Graham.

Therefore, Mr. Graham holds a first priority secured claim on the Debtor's home in the amount of $49,903.03. (He also has his unsecured claim of $75,000.) The Trustee holds a second priority secured position in the amount of $75,000 arising from the Mortgage Modification Agreement. No party disputes the primacy of these first and second secured positions totaling approximately $125,000 and encumbering the Debtor's home. Rather, the primary remaining dispute involves who is entitled to the remaining equity in the home.

The Debtor valued her home at $215,000 on the date she filed this Chapter 13 case. Given today's rising real estate market, the remaining equity is at least $90,000 and possibly higher. White and Planbridge assert they are entitled to a third priority equitable lien or constructive trust against the Debtor's home because the house was purchased exclusively with funds fraudulently obtained by the Debtor and Tringham. In response, the Trustee asserts that, pursuant to §§ 544 and 549 of the Bankruptcy Code, White and Planbridge cannot obtain a superior position to the Trustee because only the Trustee can avoid the unrecorded equitable lien arising from the fraudulent transfer of the $179,500 used to buy the Debtor's home. In order to resolve the complexities of these competing positions, a more thorough analysis of the claims raised in Adversary Proceeding 00–258 is necessary.

*The Priority of Liens against the Debtor's Homestead.* The Complaint filed by White in Adversary Proceeding No. 00–0258 contains three counts. In Counts One and Three, White asserts that he, or Planbridge, is entitled to an equitable lien or constructive trust[11] on the Debtor's home in the amount of $179,500. The Debtor denies that White or Planbridge is entitled to an equitable lien or constructive trust. Recognizing the Trustee's interests on behalf of the estate, Graham's interest as both a secured and unsecured mortgage holder, and the Debtor's interest in her home, White asks the Court to determine the extent, validity, and priority among the various competing interests.

---

11. See footnote 1 above.

In Count Two, White alleges that the Debtor fraudulently acquired her home using $179,500 in Planbridge's funds. White asks the Court to avoid the purchase of the Debtor's home as a fraudulent transfer pursuant to Florida's statute governing fraudulent transfers, § 726.105, and to award fees and costs. White previously objected to the Debtor's claim of exemption in her home (Doc. No. 71). On December 15, 2000, an order was entered overruling this objection (Doc. No. 167) in anticipation of the ruling subsequently issued by the Florida Supreme Court in *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018 (Fla.2001), that thereafter was incorporated in a ruling by the Eleventh Circuit Court of Appeals in *Havoco of America, Ltd. v. Hill*, 255 F.3d 1321 (11th Cir.2001).

▮ In *Havoco*, the Florida Supreme Court determined that "the transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4" of the Florida Constitution.[12] *Havoco*, 790 So.2d at 1028. Therefore, Count Two of White's Complaint must be denied because a fraudulent transfer claim cannot defeat the Debtor's homestead protection. However, White can still properly assert a claim for an equitable lien or constructive trust pursuant to Counts One and Three of his Complaint. In *Havoco*, the Florida Supreme Court acknowledged that, on rare occasions and with the utmost regard for the exceptions to the homestead exemption, it had "invoked equitable principles to reach beyond the literal language of the

exceptions .... where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." *Havoco*, 790 So.2d at 1023. In this case, White has alleged sufficient fraudulent or egregious conduct to fall securely within the Florida Supreme Court's equitable jurisprudence as articulated in *Havoco*.

The Trustee asserted in her counterclaim seeking a declaratory judgment that the Trustee's interest in the Debtor's home takes priority over any lien or priority position asserted by White pursuant to Bankruptcy Code Sections 544(a), 549, 551, and Florida Statute 695.01. The Trustee also asserted three cross claims. In the first cross claim, the Trustee seeks a constructive trust upon the Debtor's homestead pursuant to Bankruptcy Code Sections 105, 544(a)(1) and (a)(2). In the second cross claim, the Trustee sued the Debtor and White and seeks to sell the bankruptcy estate's interest in the Debtor's homestead pursuant to § 363(h). In the third cross claim, the Trustee seeks the authority to sell the estate's interest in the Debtor's homestead pursuant to § 363(f)(3) free and clear of Graham's lien.

Prior to trial, the parties resolved many of the issues raised in White's Complaint and the Trustee's counterclaim and cross-claims regarding the priority of liens on the Debtor's homestead. The parties agreed that Graham holds a $49,303.03 lien in first priority position based on a valid security interest in the Debtor's house and that the Trustee holds a $75,000 lien in second priority position. Further, the

---

**12.** Florida's homestead exemption provides, in pertinent part:

There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for

the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead....

Art. X, § 4(a)(1), Fla. Const.

Debtor, Graham, White, and the Trustee agreed to the sale of the Debtor's home, pursuant to § 363(f) and (h) of the Bankruptcy Code, with distributions of the proceeds to be determined by this order. The only remaining dispute is whether White or the Trustee is entitled to an equitable lien or constructive trust for $179,500 holding a third priority secured position on the equity remaining in the Debtor's home after the first and second mortgages are paid (the "Remaining Equity").

White asserts that he is entitled to a constructive trust or an equitable lien against the Remaining Equity because the home was purchased with funds the Debtor fraudulently obtained from Planbridge. Indeed, the Trustee concedes that White is entitled to both a constructive trust or equitable lien. However, the Trustee argues that any constructive trust or equitable lien granted to White is inferior to the Trustee's position because the interest is an avoidable unrecorded interest in real property pursuant to § 544(a)(3) and Florida Statute § 695.01. In contrast, White argues that his entitlement to an equitable lien or a constructive trust should be excluded from the estate pursuant to § 541(d). Before resolving this issue, however, the Court first must analyze whether either White or the Trustee is entitled to a constructive trust or an equitable lien. Only then can the Court determine whether such trust or lien constitutes property of the estate pursuant to the Trustee's various § 544 strong-arm powers or whether, instead, the property encumbered by such trust or lien is properly excluded from the estate pursuant to § 541(d).

■ *White's Claim for a Constructive Trust.* Florida courts have held that, to demonstrate a constructive trust, a plaintiff must prove four elements by clear and convincing evidence: 1) a promise, express or implied; 2) a transfer of property and reliance thereon; 3) a confidential relationship; and, 4) unjust enrichment. *Provence v. Palm Beach Taverns Inc.*, 676 So.2d 1022, 1025 (Fla. 4th Dist.Ct.App.1996). Here, White has not proven the existence of a confidential relationship with the Debtor.

■ The Debtor has, without question, been unjustly enriched. The Debtor obtained and used Planbridge's funds to purchase her home without any right to use the monies. She and Tringham essentially stole the funds. However, no confidential relationship existed between the Debtor and Planbridge or White. At most, the Debtor's relationship with Planbridge was as a transactional broker. Florida Statute 475.272(4) specifically provides that "[t]ransaction brokers provide a limited form of *nonfiduciary* representation to a buyer, seller, or both in a real estate transaction." *See* Fla. Stat. 475.272(4) (*emphasis added*). As such, the Debtor had no legal fiduciary relationship to White/Planbridge.

■ Apart from the lack of any statutorily created confidential relationship, Florida courts have addressed the nature of a confidential relationship necessary to assert a constructive trust:

[It] is not essential that such confidential relation be predicated on that of husband and wife, parent and child, guardian and ward, attorney and client, principal and agent, or partner and partner, as some of the authorities may seem to imply. The test is whether or not the relation *is in fact* shown to exist. The origin of the confidence is immaterial, and the relation may be *legal, moral, social, domestic, or personal.*

*Claycomb v. Combs*, 676 So.2d 523, 524 (Fla.2d Dist.Ct.App.1996) *citing Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 422

(1927). Thus, the Court must examine whether or not a confidential relationship was *in fact* shown to exist, even if no legal fiduciary relationship was present. To demonstrate a confidential relation, courts should examine whether "influence has been acquired and abused" and whether "confidence has been reposed and betrayed." *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 422 (1927).

■ Tringham had a confidential relationship with White and the Planbridge directors. He convinced and cajoled them to invest $240,000 based on his promises. However, the Debtor herself did not have such a relationship with either Planbridge or with White individually. The Debtor's actual contact with the Planbridge directors and White was very limited. She met White and the other directors a couple of times and posed as a person capable of resolving the encroachment issue. She admittedly did not represent the true nature of her relationship with Tringham, Associates, Equity Realty, or Moukhtara. Instead of inducing White and Planbridge to rely on her expertise and knowledge, she hid her true status from them. She played no part in convincing the Planbridge directors to make their $240,000 investment. Although the Debtor was very active in orchestrating the scam and helping Tringham in his efforts, the Debtor did not develop any confidential relationship with the Planbridge directors. She made no promises to solve the encroachment issue or obtain an accounting until July, 1998, long after Planbridge's monies were used to buy her home.

On these facts, the Debtor did not acquire or abuse any confidence reposed in her by Planbridge. The contact between the Debtor and Planbridge was too limited to establish any confidential relationship, and even if such a relationship were to later arise, the embezzlement of Plan-bridge's funds already had taken place. Accordingly, White is not entitled to a constructive trust against the Debtor's home. For similar reasons, the Trustee is not entitled to a constructive trust as requested in her first cross claim. However, in the alternative, even if White *were* entitled to a constructive trust, the Trustee could avoid the constructive trust under her strong-arm avoiding powers granted in § 544(a)(3) of the Bankruptcy Code.

■ White, relying on § 541(d) of the Bankruptcy Code, argues that his alleged constructive trust arose on the day the Debtor used Planbridge's stolen funds to buy her home, May 28, 1998. If so, the constructive trust arose long before this Chapter 13 case was filed, and the Debtor holds only legal, and not equitable title, to her home. She would hold the home in trust for White, the equitable owner. The Trustee's interest in the Debtor's home is restricted to the interest the Debtor held on the day she filed bankruptcy, which, White argues, is subject to his constructive trust. The Trustee, relying on her strong-arm powers granted in § 544(a), states that White's interest was a secret, unrecorded interest on the day the bankruptcy case was filed and, as such, is subject to avoidance.

■ In order to resolve the tension between the Trustee's strong-arm powers in § 544 and the exclusion of property from the estate under § 541(d), the first issue is whether White's claim for a constructive trust arose before or after this bankruptcy was filed. A "constructive trust is a remedial device with dual objectives: to restore property to the rightful owner and to prevent unjust enrichment." *Provence v. Palm Beach Taverns Inc.*, 676 So.2d 1022, 1025 (Fla. 4th Dist.Ct.App. 1996) (*citing Abreu v. Amaro*, 534 So.2d 771 (Fla.3d Dist.Ct.App.1988)). Florida courts have consistently followed the ma-

jority rule that a constructive trust arises when facts giving rise to fraud occur, not when a court finally enters an order granting a constructive trust.[13] Thus, "[a constructive trust] arises when the duty to make restitution arises, not when that duty is subsequently enforced." *In re General Coffee Corp.*, 828 F.2d 699, 703 (11th Cir. 1987) (*citing* A. Scott, The Law of Trusts § 462.4 (3d ed.1967)).[14] Therefore, White is correct that his claim for a constructive trust arose pre-petition on May 28, 1998, even though he did not learn of the fraud until after this bankruptcy was filed.

■■■■■ The Court now turns to whether White's claim of constructive trust is excluded from the estate by § 541(d), or whether the Trustee can bring the trust into the estate pursuant to § 544(a) for the benefit of all creditors.

Sections 541(d) and 544(a) provide, in relevant part, as follows:

§ 541. *Property of the estate*

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

§ 544. *Trustee as lien creditor and as successor to certain creditors and purchasers*

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned

---

**13.** *See Wilkins v. Wilkins*, 144 Fla. 590, 198 So. 335 (1940); *City of Sarasota v. Dixon*, 146 Fla. 369, 1 So.2d 198 (1941); *Mayer v. Cianciolo*, 463 So.2d 1219, 1221 (Fla.3d Dist.Ct. App.1985); *Malkus v. Gaines*, 434 So.2d 957, 960–61 (Fla.3d Dist.Ct.App.1983) *pet. for rev. denied*, 446 So.2d 100 (Fla.1984); *Johnson v. Johnson*, 349 So.2d 698, 699 (Fla. 4th Dist.Ct. App.1977); *Hallam v. Gladman*, 132 So.2d 198, 204 (Fla.2d Dist.Ct.App.1961); *Traub v. Traub*, 102 So.2d 157, 158 (Fla.2d Dist.Ct. App.1958) (all applying, if not expressly adopting, the majority rule); *but see Palmland Villas I Condominium Assoc. v. Taylor*, 390 So.2d 123, 124 (Fla. 4th Dist.Ct.App.1980) (the only Florida appellate decision to reject the majority approach).

**14.** Indeed, the Eleventh Circuit Court of Appeals, in *dicta*, stated that, if Florida's Supreme Court was presented with the issue of whether a constructive trust arises at the time of the fraud, "the Florida Supreme Court would reaffirm the majority approach that constructive trusts arise when the facts giving rise to the fraud occur." *In re General Coffee Corp.*, 828 F.2d 699, 702 (11th Cir.1987).

unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C § 544(a)(1)–(3).

The Eleventh Circuit Court of Appeals, in the seminal case of *In re General Coffee Corp.,* 828 F.2d 699, 704 (11th Cir.1987), acknowledged the potential for tension between § 541(d), which excludes certain equitable interests from the estate, and § 544(a), which "permits the trustee to avoid secret liens against property in the debtor's possession" so that the trustee can bring "tainted property" into the estate.

For example, where the debtor holds certain real property in constructive trust for another because of fraud, § 541(d) excludes from the estate the constructive trust beneficiary's equitable interest in the property.[15] It appears, however, that § 544(a) would bring the trust property into the estate in spite of § 541(d). Section 544(a) would permit the bankruptcy trustee to bring the constructive trust property into the estate through his strong-arm powers as a hypothetical bona fide purchaser because a constructive trust beneficiary's

interest in real property is, by definition, an unrecorded interest, which is inferior to the interest of a bona fide purchaser of the real property.[16]

*General Coffee,* 828 F.2d at 704–705. In *General Coffee,* the Bankruptcy Court found that the Debtor, General Coffee, defrauded the plaintiffs, City National Bank of Miami and City National Banking Corporation, ("CNB") and that CNB sufficiently traced its funds to a constructive trust *res* of $6,488,011. The Eleventh Circuit Court of Appeals held that CNB was entitled to a constructive trust over these funds because constructive trust beneficiaries hold the same rights to trust assets that express trust beneficiaries hold. Express trust beneficiaries have priority to trust assets over judicial lienholders or execution creditors, as contemplated by the trustee's strong-arm powers in § 544(a)(1) and (2). *General Coffee,* 828 F.2d at 706–707. Thus, in the Eleventh Circuit, the rule is clear that §§ 544(a)(1) and (a)(2) yield to the exclusion of property of the estate as provided in § 541(d).

Other courts have resolved the tension between § 541(d) and § 544(a) differently. In general, two approaches have emerged, and each approach was succinctly detailed by the Eleventh Circuit in *General Coffee.* Some courts have held that § 541(d) prevails over the trustee's strong-arm powers under § 544(a)[17] because "although § 544(a)'s strong-arm powers allow a trustee to assert rights that the debtor itself could not claim to property, Congress did not mean to authorize a bank-

---

15. *General Coffee,* 828 F.2d at 704 (*citing Quality Holstein Leasing,* 752 F.2d at 1012; *In re Elin,* 20 B.R. 1012, 1015–16 (D.N.J. 1982), *aff'd mem.,* 707 F.2d 1400 (3d Cir. 1983)).

16. *Id.* at 705 (*citing In re Eads,* 69 B.R. 730, 735 (9th Cir. BAP 1986); *In re Cascade Oil Co.,* 65 B.R. 35, 42 (Bankr.D.Kan.1986); *In re*

*Great Plains Western Ranch Co.,* 38 B.R. 899, 906 (Bankr.C.D.Cal.1984)).

17. *Id.* (*citing Quality Holstein Leasing,* 752 F.2d at 1013; *In re Triple A Coal Co.,* 55 B.R. 806, 813 (Bankr.S.D.Ohio 1985); *In re Earl Roggenbuck Farms, Inc.,* 51 B.R. 913, 917 (Bankr.E.D.Mich.1985)).

ruptcy estate to benefit from property that the debtor did not own." [18]

Other courts have held that property not part of the estate under § 541(d) may come into the estate under § 544(a).[19] These courts have reasoned that " § 544(a) arms the trustee at the time of the filing of the debtor's bankruptcy petition with all the rights and powers of various creditors and transferees of the debtor so as to avoid incomplete or improperly perfected transfers of the debtor and thereby insure an equality of distribution among the debtor's general unsecured creditors." [20] Courts supporting this position explain that it is consistent with the letter and spirit of the Bankruptcy Code.[21]

Ultimately, however, the Eleventh Circuit did not resolve the tension between §§ 541(d) and 544(a). The Court declined to definitively address the impact of § 544(a)(3), or whether a trustee's strong-arm powers as a bona fide purchaser of real property under § 544(a)(3) can defeat the claim of a constructive trust which encumbers real property but is otherwise secret and unrecorded on the day the bankruptcy was filed. In what appears to be *dicta*, the Eleventh Circuit cited Professor Scott's treatise on trusts for the proposition that "a constructive trust beneficiary prevails over all subsequent takers of the trust property *except bona fide purchasers*." *General Coffee*, 828 F.2d at 706–707 (*citing* A. Scott, The Law of Trusts § 462.4, at 3621) (*emphasis added*). Thus, the Eleventh Circuit intimated that a trustee's powers as a judicial lienholder and execution creditor must yield to the

rights and interests of a constructive trust beneficiary, but that a trustee's powers as a bona fide purchaser of real property overpower the rights and interests of a constructive trust beneficiary, unless the interest was properly recorded before the bankruptcy case was filed.

This result is consistent with Florida law governing conveyances of real estate. Florida Statute 695.01 provides, in relevant part:

695.01. Conveyances to be recorded

(1) No conveyance, transfer, or mortgage of real property, or of any interest therein, nor any lease for a term of 1 year or longer, shall be good and effectual in law or equity against creditors or subsequent purchasers for a valuable consideration and without notice, unless the same be recorded according to law....

Fla. Stat. 695.01.

In Florida, therefore, the transfer of a permanent interest in real property is not enforceable against creditors or subsequent purchasers *unless* the conveyance was properly recorded.

Furthermore, this result is consistent with the goals underlying bankruptcy. The Sixth Circuit Court of Appeals in *In re Omegas Group, Inc.*, 16 F.3d 1443, 1452–53 (6th Cir.1994) provides the following thoughtful analysis concerning the policy underlying a trustee's strong-arm powers in bankruptcy:

To a party defrauded by [a] debtor, incorporating the proceeds of fraud in

---

**18.** *Id.* (*citing Quality Holstein Leasing*, 752 F.2d at 1013. (internal quotations omitted)).

**19.** *Id.* (*citing Cascade Oil Co.*, 65 B.R. at 39; *In re Dlott*, 43 B.R. 789, 792 (Bankr.D.Mass. 1983); *Great Plains*, 38 B.R. at 902–05; *In re Anderson*, 30 B.R. 995, 1009–10 (M.D.Tenn. 1983); *Elin*, 20 B.R. at 1016).

**20.** *Id.* (*citing* 4 L. King, Collier on Bankruptcy ¶ 541.01, 541–5 to 541–9 and ¶ 544.01, 544–2 to 544–4 (15th ed.1982); 2 W. Norton, Bankruptcy Law and Practice §§ 29.01 and 30.01 (1982)).

**21.** *Id.* (*citing Great Plains*, 38 B.R. at 907).

the debtor's estate may seem like allowing the "estate to benefit from property that the debtor did not own."[22] But as the Seventh Circuit has pointed out, "allowing the estate to 'benefit from property that the debtor did not own' is exactly what the strong-arm powers are about: they give the trustee the status of a bona fide purchaser for value, so that the estate contains interests to which the debtor lacked good title."[23] The Code recognizes that each creditor has suffered disappointed expectations at the hands of the debtor; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.

*Omegas,* 16 F.3d at 1452–53. Thus, the Trustee, standing in the position of a bona fide purchaser of real property without notice of unrecorded interests as of the commencement of the case granted under § 544(a)(3), can avoid any secret constructive trust, such as the one claimed by White. Therefore, in this case, White not only failed to prove he is entitled to a constructive trust because he lacked any confidential relationship with the Debtor, he also has failed to prove that the Remaining Equity in the Debtor's home is properly excluded from the estate pursuant to § 541(d). If a constructive trust had been shown, the Trustee could have avoided any claim for an unrecorded constructive trust encumbering real estate under § 544(a)(3) and brought the property into the estate for the benefit of all creditors.

White's Claim for an Equitable Lien. The Court next examines White's request for an equitable lien, which entails a very different analysis. The "prevailing view in Florida is that equitable liens may be founded upon two bases: (1) a written contract that indicates an intention to charge a particular property with a debt or obligation; or, (2) a declaration by a court out of general considerations of right or justice as applied to the particular circumstances of a case." *In re Tsiolas,* 236 B.R. 85, 88 (Bankr.M.D.Fla.1999) (*citing Jones v. Carpenter,* 90 Fla. 407, 413–14, 106 So. 127 (1925); *Ross v. Gerung,* 69 So.2d 650, 652 (Fla.1954)). Courts must look to applicable state law when determining whether an equitable lien should be imposed. *Tsiolas,* 236 B.R. at 88.

Here, White does not rely upon any written contract or agreement but instead argues that "general considerations of right or justice" merit the granting of an equitable lien on the particular facts of this case. In *Palm Beach Savings & Loan Assoc., F.S.A., et al. v. Fishbein,* 619 So.2d 267, 271 (Fla.1993), the Florida Supreme Court found that "in order to prevent unjust enrichment" and "where equity demands" equitable liens can encumber homestead property. Courts imposing equitable liens on homestead property require a very high standard. *In re Diamond,* 196 B.R. 635, 639 (Bankr. S.D.Fla.1996) ("[W]hen homestead rights are in jeopardy, Florida law requires far more than a mere equitable basis for the imposition of an equitable lien because the homestead right is a constitutional, fundamental right."). Typically, an equitable lien is imposed upon homestead property only if the misappropriated funds are

---

**22.** *Omegas,* 16 F.3d at 1452 (*citing Quality Holstein Leasing,* 752 F.2d 1009, 1013 (5th Cir.1985)).

**23.** *Id.* (*citing Belisle v. Plunkett,* 877 F.2d 512, 516 (7th Cir.1989) (criticizing *Quality Holstein Leasing* )).

traced directly into the homestead and the misappropriation occurred due to fraud and reprehensible conduct. *Diamond,* 196 B.R. at 639. *See also In re Meltzer* 171 B.R. 166 (Bankr.S.D.Fla.1994); *Fidelity Serv. Co. v. Grocki (In re Grocki),* 147 B.R. 274, 278 (Bankr.S.D.Fla.1992) (requiring a fraudulent or egregious act on the part of a homestead beneficiary). The heightened standards applied by the Bankruptcy Courts for Florida's Southern District are consistent with the recent Florida Supreme Court case of *Havoco of America, Ltd. v. Hill,* 790 So.2d 1018, 1027–28 (Fla. 2001), in which the Court addressed the limits of the exceptions to Florida's homestead exemption. In *Havoco,* The Florida Supreme Court held that equitable principles could be invoked "to reach beyond the literal language of [Florida's homestead] exceptions *only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead." Havoco,* 790 So.2d at 1028 (*emphasis added*).

 Applying this standard to the facts in this case, White is entitled to an equitable lien. The Debtor, with substantial help from Tringham, stole money from White and the other Planbridge investors, bought her home almost exclusively with these funds, went to great lengths to hide her actions, and now seeks to lessen her role in the fraud. The Debtor was a knowing and active participant in the fraud. The Debtor, through fraudulent and egregious conduct, obtained funds from White and Planbridge which she used to buy her home. The facts in this case illustrate a textbook example of facts justifying. the imposition of an equitable lien. Therefore, White is entitled to an equitable lien in third priority position for the full amount of funds received by the Debtor, $179,500.

In this case, White's equitable lien arises upon the entry of this order, long after this bankruptcy was filed. As opposed to a constructive trust, which arises at the time of the fraud, an equitable lien arises when decreed to exist by a court from the facts and circumstances of the case. *Carman v. Gunn* 198 So.2d 76, 83 (Fla.2d Dist.Ct.App. 1967). An equitable lien is "a charge on the thing which can be enforced only in equity." *Id.*

White acknowledges that his equitable lien is subject to prior recorded liens encumbering the Debtor's homestead. The law is well settled in Florida that rights of valid lienholders, without notice, are superior to the rights of the holder of an equitable lien. *In re Tsiolas,* 236 B.R. 85, 89 (Bankr.M.D.Fla.1999) (*citing Wilson v. Kleinfeld (In re Garrett Marine, Inc.),* 92 B.R. 519, 521 (Bankr.M.D.Fla.1988)) (*citing Blumin v. Ellis,* 186 So.2d 286, 295–96 (Fla.2d Dist.Ct.App.), *cert. denied,* 189 So.2d 634 (Fla.1966); *Westburne Supply, Inc. v. Community Villas Partners, Ltd.,* 508 So.2d 431 (Fla.1st Dist.Ct.App.)); *Lynch, Pierce, Fenner & Smith v. George,* 516 So.2d 1068, 1069 (Fla. 4th Dist.Ct.App. 1987). Therefore, White concedes his equitable lien is subordinate to the first priority lien of Mr. Graham and the second priority lien held by the Trustee pursuant to Graham's avoided second mortgage. However, White asserts that his claim for an equitable lien on the Remaining Equity is superior to the interest of the Trustee and the other unsecured creditors.

 White's claim for an equitable lien arose post-petition, only upon the entry of this order. The Trustee only inherited the rights and powers in existence on the date this bankruptcy was filed, months before this equitable lien arose. The Trustee's strong-arm avoiding powers under § 544 simply do not extend to allow a trustee to defeat the creation of post-petition liens by the bankruptcy court. While Bankruptcy Code Section 549 does permit

a Trustee to avoid certain post-petition transfers, that section does not permit a Trustee to avoid post-petition transfers, such as a grant of an equitable lien, awarded by a bankruptcy court. *See In re Halabi,* 184 F.3d 1335, 1337 (11th Cir.1999) (Section 549 "authorizes a trustee to avoid certain post-petition transfers *which are not authorized by the bankruptcy court or by a court of competent jurisdiction.*") (*emphasis added*). Indeed, a contrary result would prohibit bankruptcy courts from ever awarding post-petition equitable relief.

If White had obtained a court order awarding an equitable lien before this bankruptcy was filed and then failed to appropriately record his lien, the Trustee could have avoided the lien under § 544(a)(3). However, White did not make and could not make such a request because he was not aware of the fraud until long after the Debtor filed this case. Instead, he asked this Court based on the unique and egregious facts presented to now impose an equitable lien. He is entitled to such a lien which, granted, gives him a superior position over other unsecured creditors to claim the Remaining Equity in the Debtor's home. Justice and equity support this result. But for the Debtor's fraud and theft of White's monies, she never would have acquired her home. No other creditor or the Trustee has the ability to raise a claim for an equitable lien over the Debtor's home because the home is exempt from creditor claims, except for the limited relief given to equitable lien

claimants in *Havoco*. Therefore, White's monies directly bought the home which is not subject to the Trustee's liquidation or administration to pay creditors' claims.[24] Nor is White's equitable lien subject to the Trustee's strong-arm avoidance powers.

Therefore, in Adversary Proceeding 00–258, White is entitled to a judgment in his favor and against the remaining defendants holding that he has an equitable lien in the amount of $179,500 which is a third priority lien encumbering the Debtor's home. The Trustee is directed to sell the Debtor's home pursuant to § 363 of the Bankruptcy Code, to pay all appropriate closing costs to be subsequently approved by the Court by separate motion and order, and to distribute the net proceeds according to priority of the liens held by Mr. Graham in first position ($49,903.03), the Trustee on behalf of unsecured creditors in the estate in second position ($75,000), and Mr. White in third position ($179,500).

◼ *Florida's Real Estate Recovery Fund and White's Motion for Relief from Stay.* The final matter at issue is White's Motion for Relief from Stay. White seeks to have the automatic stay lifted to initiate a complaint against the Debtor with FREC, a division of Florida's Department of Business and Professional Regulation. Specifically, White requests permission to assert a claim against the Debtor that she was Planbridge's broker and that, while acting in that capacity, the Debtor commit-

---

**24.** The Court recognizes that the Trustee holds, for the benefit of all creditors in this estate, a second priority position arising from the avoidance of Mr. Graham's improperly recorded Mortgage Modification Agreement. The Trustee merely is subordinated to Mr. Graham's claim as a mortgagee with a lien on the Debtor's homestead property. Mr. Graham's interest arose from a mortgage voluntarily granted by the Debtor and is one of the three exceptions to homestead protection set forth in the Florida Constitution. Certainly, the Trustee is entitled to recover upon this mortgage and to that extent administer the liquidation of the Debtor's home in this case. However, the Trustee has stated no rationale that would allow her to assert a claim against the otherwise exempt Remaining Equity in the Debtor's home.

ted fraud resulting in a loss of $179,500 in Planbridge's funds. White hopes to recover Planbridge's funds from the Real Estate Recovery Fund (the "Fund"), a "statutory source of compensation for persons who have suffered monetary damages by .... acts committed as a part of any transaction involving the sale of real property in Florida by any broker or salesperson." *In re Hirsch,* 50 B.R. 8 (Bankr. S.D.Fla.1985) (*citing* Fla. Stat. § 475.482).[25]

 The Fund is a remedial device through which the FREC can reimburse members of the public who have been defrauded or otherwise monetarily harmed by a member of the real estate profession.

Florida Statute § 475.483 [26] provides that, before White can recover from the Fund, White must obtain a final judgment against the Debtor. The filing of a bankruptcy petition by a broker does not automatically relieve claimants from the obligation to obtain a final judgment against a broker. Rather, where a broker files a bankruptcy petition, the party alleging wrongful conduct "must seek to have assets involving the real estate transaction that gave rise to the claim removed from the bankruptcy proceedings so that the matter might be heard in a court of competent civil jurisdiction ..." Fla. Stat. § 475.483 (2000). If White is successful in his claim, Florida Statute § 475.25 [27] pro-

**25.** 475.482. Real Estate Recovery Fund

There is created the Florida Real Estate Recovery Fund as a separate account in the Professional Regulation Trust Fund.

(1) The Florida Real Estate Recovery Fund shall be disbursed as provided in s. 475.484, on order of the commission, as reimbursement to any person, partnership, or corporation adjudged by a court of competent civil jurisdiction in this state to have suffered monetary damages by reason of any act committed, as a part of any real estate brokerage transaction involving real property in this state, by any broker or salesperson who:

(a) Was, at the time the alleged act was committed, the holder of a current, valid, active real estate license issued under this part;

(b) Was neither the seller, buyer, landlord, or tenant in the transaction nor an officer or a director of a corporation, a member of a partnership, a member of a limited liability company, or a partner of a limited liability partnership which was the seller, buyer, landlord, or tenant in the transaction; and

(c) Was *acting solely in the capacity of* a real estate licensee in the transaction; provided the act was a violation proscribed in s. 475.25 or s. 475.42.

Fla. Stat. § 475.482.

**26.** 475.483. Conditions for recovery; eligibility

(1) Any person is eligible to seek recovery from the Real Estate Recovery Fund if:

(a) Such person has received a final judgment in a court of competent civil jurisdiction in this state against an individual broker or salesperson in any action wherein the cause of action was based on a real estate brokerage transaction. If such person is unable to secure a final judgment against a licensee due to the death of the licensee, the commission may waive the requirement for a final judgment. The filing of a bankruptcy petition by a broker or salesperson does not relieve a claimant from the obligation to obtain a final judgment against the licensee. In this instance, the claimant must seek to have assets involving the real estate transaction that gave rise to the claim removed from the bankruptcy proceedings so that the matter might be heard in a court of competent civil jurisdiction in this state. If, after due diligence, the claimant is precluded by action of the bankruptcy court from securing a final judgment against the licensee, the commission may waive the requirement for a final judgment.

Fla. Stat. § 475.483.

**27.** The relevant portion of Fla. Stat. § 475.25 reads as follows:

(1) The commission may deny an application for licensure, registration, or permit, or re-

vides that FREC can take certain disciplinary actions against the Debtor if it finds that the Debtor committed any infraction listed in Florida Statute § 475.25(a)-(t). Among FREC's disciplinary powers are the power to issue reprimands, fines, and to revoke or suspend a broker's real estate license.

In his Motion, White seeks relief from the automatic stay to file a complaint against the Debtor with the FREC. Although White asserts such relief may not be mandated pursuant to the exception set forth in § 362(b)(4) of the Bankruptcy Code, White filed the Motion under § 362(d) of the Bankruptcy Code asserting that he has demonstrated sufficient "cause" to justify modifying the automatic stay.

▆▆▆▆ The automatic stay can be lifted if an interested party demonstrates "cause." *See* 11 U.S.C. § 362(d)(1). Cause is not defined in the Bankruptcy Code. *In re Robertson,* 244 B.R. 880, 882 (Bankr.N.D.Ga.2000). Therefore, courts must determine "cause" by examining the totality of the circumstances in each particular case. *Robertson,* 244 B.R. at 882 (*citing Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90 (3d Cir.1997); *Trident Assoc. v. Metro. Life Ins. Co. (In re Tri-*

*dent Assoc.),* 52 F.3d 127, 131 (6th Cir. 1995)).

▆▆▆▆ In this case, more than sufficient cause exists to lift the automatic stay. As the Court has previously held in allowing White's/Planbridge's claim for $179,500, the Debtor was an active and knowing participant in the fraud orchestrated by Tringham and herself. The Debtor was the single common factor among every participant to the Lake Bryan project—the seller, Moukhtara, the adjacent landowner, Equity Realty, her former employer, Tricor, the buyers, Tringham's company, Associates, and Planbridge. The Debtor was involved in every aspect of the transaction. She witnessed and signed the Contract that attached the Fraudulent Assignment. The Debtor's prior experience in commercial real estate for thirty years undermines her ability to disclaim an understanding of the differences between the Original Assignment and the Fraudulent Assignment or the suspect nature of her involvement in this transaction. The Debtor is an experienced real estate broker and can comprehend the nuances of sophisticated financial transactions. For these and other reasons, the Court rejects the Debtor's argument that she was naïve and uninformed.

newal thereof; may place a licensee, registrant, or permittee on probation; may suspend a license, registration, or permit for a period not exceeding 10 years; may revoke a license, registration, or permit; may impose an administrative fine not to exceed $1,000 for each count or separate offense; and may issue a reprimand, and any or all of the foregoing, if it finds that the licensee, registrant, permittee, or applicant:

 (b) Has been guilty of fraud, misrepresentation, concealment, false promises, false pretenses, dishonest dealing by trick, scheme, or device, culpable negligence, or breach of trust in any business transaction in this state or any other state, nation, or territory; has violated a duty imposed upon her or him by law or by the terms of a listing contract, written, oral, express, or implied, in a real estate transaction; has aided, assisted, or conspired with any other person engaged in any such misconduct and in furtherance thereof; or has formed an intent, design, or scheme to engage in any such misconduct and committed an overt act in furtherance of such intent, design, or scheme. It is immaterial to the guilt of the licensee that the victim or intended victim of the misconduct has sustained no damage or loss; that the damage or loss has been settled and paid after discovery of the misconduct; or that such victim or intended victim was a customer or a person in confidential relation with the licensee or was an identified member of the general public.

Fla. Stat. § 475.25 (2000).

The Debtor was both informed and a major participant in the fraud that caused direct damage to Planbridge.

White has little hope of recovering his entire loss in this bankruptcy case. He may receive as much as $100,000 from the equitable lien and resulting sale of the Debtor's home, but he certainly will not recover his entire damage of almost $180,000. The Fund is designed to reimburse parties such as White who are defrauded by a Florida real estate broker. Disbursements are authorized from the Fund only by FREC. Arguably, White can pursue this recovery only if the automatic stay is lifted. Failure to lift the stay would result in a summary denial of access to this possible source of recovery. That ground alone is sufficient to justify modification of the stay.

However, an even more important reason, which affects all creditors in this case as well as the public at large, is at issue. The Debtor holds a real estate broker's license issued and monitored by the FREC. Based upon the Debtor's conduct in connection with the Lake Bryan Property, she may not be entitled to retain this license. One consequence of allowing White to pursue his claims against the Debtor before FREC is that FREC may suspend or revoke the Debtor's real estate license. Only FREC has the expertise, experience, and authority to make this important decision.

If the Debtor's license is revoked or suspended, she likely cannot propose a Chapter 13 plan as required by § 1325 of the Bankruptcy Code. Therefore, unless and until the FREC determines whether the Debtor can remain a real estate broker, the Court can only guess as to whether the Debtor can make the payments required under her plan. All creditors in this case deserve to know sooner rather than later whether they reasonably can expect a distribution in this case.

Moreover, public interest requires that the stay be lifted. If FREC decides that the Debtor *cannot* retain her real estate license, she will not be able to represent or mislead other parties in future real estate transactions. The Court is very concerned about the harm the Debtor could inflict on other members of the public if she were to repeat the types of conduct she demonstrated in connection with the Lake Bryan project. The public should receive some protection from unscrupulous real estate brokers. Only FREC can provide this protection, and they can act only if the stay is modified.

White has amply demonstrated sufficient cause to justify modification of the automatic stay to allow White to pursue a claim against the Debtor before the FREC and, to the extent necessary, in the Florida state courts. White is entitled to pursue recovery from the Fund. The creditors in this case need to know if the Debtor can remain in her current profession and generate the income necessary to fund a plan. Most importantly, the unsuspecting public deserves protection that only FREC can provide in determining whether the Debtor can keep her real estate license. For all these reasons, the Motion is granted.

*Conclusion.* White is entitled to an equitable lien encumbering the Debtor's homestead as requested in Counts 1 and 3 of White's Complaint in the amount of $179,500. The equitable lien is in a third priority secured position following the first mortgage held by Graham in the amount of $49,903.03 and the second mortgage held by the Trustee in the amount of $75,000. White's request for a constructive trust raised in Counts 1 and 3 is denied. Further, White's claim for avoidance of a fraudulent transfer in Count 2 of the Complaint is denied.

Regarding the Trustee's cross-claims and counterclaim, the Trustee is not entitled to a constructive trust or equitable lien on the Debtor's homestead. However, the Trustee is authorized to sell the homestead, pursuant to Section 363 of the Bankruptcy Code, and distribute the net proceeds according to the priority positions awarded above.

In addition, White's Motion for Relief from Stay is granted. The automatic stay is lifted to permit White to file a complaint with FREC in order to recover any monies from the Fund. A separate judgment and scheduling order consistent with this opinion shall be entered.