**In re David M. LINSEY & Nina M. Linsey, Debtors.**

**Carlson Orchards, Inc., Plaintiff,**

**v.**

**David M. Linsey, Nina M. Linsey, Defendants.**

Bankruptcy No. 02–46169–JBR.
Adversary No. 02–4548.

United States Bankruptcy Court,
D. Massachusetts,
Western Division.

Aug. 11, 2003.

David M. Nickless, Esq., Nickless and Phillips, P.C., Fitchburg, MA, for Carlson Orchards.

John–Paul LaPre', Esq., The Law Offices of John–Paul LaPre', Marlborough, MA, for David M. Linsey and Nina M. Linsey.

## MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

Before the Court is an adversary proceeding, filed by Carlson Orchards, Inc. ("Carlson") against David and Nina Linsey (collectively the "Debtors" or the "Defendants"). The complaint [# 1] filed by Carlson includes two counts: Count I requested that the Court find that the obligation owed by Nina Linsey to Carlson in the amount of $121,865[1] be deemed non-dischargeable; Count II requested that the Court issue declaratory judgment vesting title in (1) two vehicles and (2) an interest in the amount of $40,000 in real property owned by the Linseys, in Carlson.

On March 31, 2003, the parties filed an Agreement for Judgment as to Defendant Nina M. Linsey Only [# 11], in which it was agreed that the obligation owed by Nina Linsey to Carlson is non-dischargeable. The Court entered judgment against Nina Linsey, pursuant to this agreement, on May 1, 2003. The only issue remaining before the Court is Count II, that being whether a constructive trust or equitable lien may be imposed on the vehicles and real estate improvements allegedly purchased with the funds stolen by Nina Linsey.

### Facts

In accordance with Federal Bankruptcy Rule of Procedure 7052, the Court finds as follows:

1. Nina Linsey began working for Carlson as a bookkeeper in January 2001 and continued working there until November 2001.

2. Nina Linsey was paid a gross salary of approximately $600 per week by Carlson. Nina Linsey was paid on an hourly basis and the amount of her paycheck varied week-to-week based on the number of hours worked.

3. Nina Linsey generally worked a 40-hour work week. Sometimes, however,

---

1. On July 29, 2002 Nina Linsey pled guilty to one count of larceny by check and was ordered to pay restitution of $140,000, which was later reduced to $121,865.39.

she worked a few hours of overtime. Nina Linsey's hourly wage was $15/hour.

4. Nina Linsey embezzled[2] money from Carlson. This was accomplished, in part, by diverting checks payable to Carlson and depositing those checks directly into bank accounts controlled by Nina Linsey. Nina Linsey also wrote extra paychecks to herself and deposited the extra paychecks into bank accounts she controlled.

5. Carlson issued a W–2 to Nina Linsey stating that Nina Linsey received a total of $32,606.85 in earnings from Carlson during calendar year 2001. Part of this amount is comprised of extra unauthorized payroll checks written by Nina Linsey to herself.

6. Nina Linsey and David Linsey kept separate bank accounts and did not commingle their funds. All of David Linsey's paychecks were deposited into his separate accounts.

7. On July 29, 2002 Nina Linsey pled guilty to one count of larceny by check and was ordered to pay restitution of $140,000.00 which was later reduced to approximately $121,000.00.

8. Nina Linsey used the funds she embezzled from Carlson to purchase a 1999 Plymouth Grand Caravan.

9. The Debtors listed the value of the 1999 Plymouth Grand Caravan on Schedule B in the Defendant's chapter 13 bankruptcy as $4,700.

10. The Plymouth Grand Caravan was titled in the name of David Linsey.

11. Nina Linsey used the funds she embezzled from Carlson to purchase a 1995 Ford F150.

12. The Debtors listed the value of the 1995 Ford F150 on their Schedule B as $3,850.

13. The Ford F150 was titled in the name of David Linsey.

14. Nina Linsey and David Linsey are married and live together at 11 Meadowbrook Road, Hudson, Massachusetts (the "Property").

15. David Linsey recorded a Declaration of Homestead on the Property on August 8, 1994. There were no objections to the Debtors' Declaration of Homestead or to claimed exemptions in the chapter 13 bankruptcy.

16. The fair market value of the Property on February 15, 2002 per a realtor's opinion of value was $219,900.00.

17. The current balance owed on the mortgage on the Linsey home is $139,279.73.

### Discussion

Carlson requests imposition of a constructive trust in its favor in the 1999 Plymouth Grand Voyager, the 1995 Ford F–150, and an undivided 32.26% interest in the Property. The Defendant asserts that a constructive trust does not apply in a Chapter 13 case.

■ The issue of whether constructive trusts may be imposed or recognized by bankruptcy courts has produced disparate judicial views and remains unsettled.[3] *See*

---

**2.** At trial, the Defendants objected to the use of the term "embezzlement" to describe Nina Linsey's conviction. Nina Linsey was convicted of larceny by check. The Court does not believe that the distinction is relevant to the issues to be decided.

**3.** Recently, in *City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*, 329 F.3d 204, 214 and n. 7 (1st Cir.2003), the First Circuit noted that the use of constructive trusts as a basis for excluding property from the estate has been criticized. *See also Richard Cox v. Nancy Cox*, 247 B.R. 556, 572 (Bankr.D.Mass.

Robert J. Keach, *The Continued Unsettled State of Constructive Trusts in Bankruptcy,* 103 Com. L.J. 411 (1998). Although there may be cases, such as where a trustee has invoked his strong-arm powers, in which a competing federal interest would justify a refusal to recognize a constructive trust, this case involves only a two-party dispute. No one has objected to the Debtors' exemptions; the equity in the house has been exempted. The issue is whether the Debtors may keep the entire equity or whether, if Carlson proves the elements of a constructive trust, they must share the equity with the defrauded creditor. Thus, the main policy justification that courts have given in their refusal to recognize constructive trusts is not applicable in this case and the Court sees no reason to refrain from imposing a constructive trust so long as Carlson can make the necessary showing.

■ Under the so-called "traditional approach," adopted by the First Circuit, in order to obtain a constructive trust over the property of a debtor, a party must (1) show either sufficient wrongdoing by the debtor in acquiring the property or a fiduciary relationship between the party and the debtor, and (2) be able to trace the wrongfully held property. *Connecticut Gen. Life Ins. v. Universal Ins. Co.,* 838 F.2d 612, 618 (1st Cir.1988). If both requirements are met, the constructive trust will be imposed, the property will be excluded from the estate under 11 U.S.C. § 541(d), and the property ordered turned over to the claimant. *See* Keach, *supra,* at 421. Many courts opt to strictly construe these requirements for the reason that imposition of a constructive trust in favor of one creditor can undercut the Bankruptcy Code policy of ratable distribution among similarly situated creditors. *See Richard Cox v. Nancy Cox,* 247 B.R. at 572. The first of the two requirements is easily met by Nina Linsey's admitted embezzlement. The tracing requirement, however, merits additional discussion.

■ It is well established that mere commingling of trust property with other property of the debtor does not defeat imposition of a constructive trust. *See Connecticut Gen. Life Ins.,* 838 F.2d at 619. In the case of commingling, however, the claimant bears the further burden of tracing the alleged trust property "specifically and directly" back to the illegal transfers giving rise to the trust. 4 COLLIER ON BANKRUPTCY ¶ 541.11[3](15th ed. rev.2000), *citing Taylor Assoc. v. Diamant (In re Advent Mgmt. Corp.),* 104 F.3d 293, 296 (9th Cir. 1997). The normal procedure for tracing trust proceeds which have been commingled in a bank account is by way of the "lowest intermediate balance test." The First Circuit explained the application of that test as follows:

"Under that test, set down by the Supreme Count in *Schuyler v. Littlefield,* 232 U.S. 707[, 34 S.Ct. 466, 58 L.Ed. 806] (1924)[(1914)], a court will follow the trust fund and decree restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund. Where, however, after the commingling, all the money is withdrawn, the trust fund is treated as lost, even though later deposits are made into the account. Should the amount on deposit be reduced below the amount of the trust

2000) (discussing the controversy surrounding the use of constructive trusts but declining to decide the issue of whether one should be imposed because the plaintiff could not trace

proceeds and therefore such a decision would be inappropriate); *In re CRS Steam, Inc.,* 225 B.R. 833, 836–40 (Bankr.D.Mass.1998).

fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account. This is based on the fiction that the trustee would withdraw non-trust funds first, retaining as much as possible of the trust fund in the account." *Connecticut Gen. Life Ins.*, 838 F.2d at 619

The evidence that Carlson introduced to trace the funds stolen by Nina Linsey included 11 checks written by Nina Linsey. Those checks are as follows:

1. Plaintiff's Exhibit #1. Check #1031 dated April 6, 2001 in amount of $600 payable to Barry Electric.

2. Plaintiff's Exhibit #2. Check #411 dated April 14, 2001 in amount of $600 payable to Barry Electric.

3. Plaintiff's Exhibit #3. Check #101 dated February 3, 2001 in amount of $1,250 payable to David Linsey.

4. Plaintiff's Exhibit #4. Check #390 dated April 14, 2001 in amount of $5,000 payable to Framingham Dodge.

5. Plaintiff's Exhibit #5. Check #1033 dated April 24, 2001 in amount of $5,312.75 payable to Framingham Dodge.

6. Plaintiff's Exhibit #6. Check #1028 dated April 3, 2001 in amount of $2,300 payable to Home Depot.

7. Plaintiff's Exhibit #7. Check #397 dated May 17, 2001 in amount of $6,101 payable to Home Depot.

8. Plaintiff's Exhibit #8. Check #1061 dated May 25, 2001 in amount of $6,957 payable to Home Depot.

9. Plaintiff's Exhibit #9. Check #699 dated May 2, 2001 in amount of $3,000 payable to Joe Kenney.

10. Plaintiff's Exhibit #10. Check #151 dated June 18, 2001 in amount of $4,400 payable to Joe Kenney.

11. Plaintiff's Exhibit #16. Check #1029 dated April 2, 2001 in amount of $2,034 payable to Home Depot.

At trial, it was established that the checks payable to Home Depot were for the purchase of new windows and siding for the Property and for the installation of the windows and siding, that the checks payable to Joe Kenney were for landscaping improvements to the Property, and that the checks payable to Barry Electric were for electrical improvements to the Property. It was also established that the checks to David Linsey and Framingham Dodge were payments for the two vehicles. Thus, the checks listed above sufficiently trace the funds from Nina Linsey's bank accounts to the vehicles and home improvements. The Plaintiff, however, still must identify that the funds transferred by these checks are embezzled funds, rather than legitimate funds of Nina Linsey, and therefore subject to the trust.

It is conceded by the Defendants that the two vehicles were purchased with embezzled funds, *see Joint Pre-trial Memorandum* at ¶¶ G5, G7. Thus, Carlson is relieved of his burden of having to prove the funds transferred by the checks labeled #3, #4, and #5 above, were embezzled funds.

As to the remaining checks, the eight "home improvement" checks, Carlson must show that the balance in the account upon which each check was drawn did not dip below the amount of the check during the period of time between the time that embezzled funds were deposited into the account and the time the checks were drawn upon the account.

To demonstrate this, Carlson introduced bank statements from three accounts controlled by Nina Linsey: a savings account from Community National Bank ("Community Savings Account"); a checking account from Community National Bank

("Community Checking Account"); and a checking account from Marlborough Cooperative Bank ("Marlborough Account").[4] Although Carlson did not specifically identify which deposits were embezzled funds and which deposits (if any) were legitimate funds, there is sufficient evidence for the Court to conclude that each of the eight checks was drawn upon embezzled funds. *See* George Gleason Bogert & George Taylor Bogert, *Bogert's Trusts and Trustees* § 923 (rev.2d ed.1984), citing *Tucker v. Brown*, 20 Wash.2d 740, 150 P.2d 604 (1944) (tracing of trust funds may be done by circumstantial evidence).

As a starting point, the initial balance in each of the three accounts was as follows: $2,523.19 in the Community Savings Account on January 12, 2001; $0 in the Community Checking Account on January 30, 2001 (the day the account was opened); and $843.69 in the Marlborough Account on January 30, 2001.

Over the course of the next nine months, Nina Linsey deposited over $32,000 into the Community Savings Account, $80,000 into the Community Checking Account, and $41,000 into the Marlborough Account.[5] Many of these deposits were in excess of $2,000.[6] The total of these deposits far exceeds the income that Nina Linsey claimed she received, from employment, operation of a business or otherwise, for calendar year 2001, on the Statement of Financial Affairs [7] filed by the Debtors in their underlying Chapter 13 bankruptcy case, the amount of such income being $32,606.85.[8]

The Defendants offered no evidence that Nina Linsey deposited her legitimate paychecks into the accounts, nor did the Defendants make any effort to identify specific funds that were legitimate funds in these checking accounts. There was uncontroverted testimony at trial that Nina Linsey earned $15/hour from Carlson and

4. The Marlborough Account is in the name of both David and Nina Linsey, however, at trial it was established that David Linsey did not use the Marlborough Account.

5. The bank statements indicate that Nina Linsey transferred funds between the three accounts and made frequent ATM withdrawals. It is therefore possible that some of these deposits represent transfers rather than deposits of new funds.

6. The Community Savings Account deposits include deposits of $4,200 on January 16, 2001; $3,254.60 on January 23, 2001; $5,245.50 on February 6, 2001; $3,258.46 on February 20, 2001; $4,153.15 on March 6, 2001; $4,153.15 on March 28, 2001; $2,537.45 on April 2, 2001; $13,512.68; and $4,155.25 on April 20, 2001. The Community Checking Account deposits include deposits of $2,500 on January 31, 2001; $4,354.00 on April 2, 2001; $6,000 on April 24, 2001; $2,000 on May 4, 2001; $7,500 on May 18, 2001; $6,905.24 on May 30, 2001; $2,000 on May 31, 2001; $2,561.03 on June 6, 2001; $5,615.39 on June 19, 2001; $2,900.88 on June 26, 2001; $2,286.12 on July 11, 2001; $6,757.40 on July 27, 2001; $4,500 on August

3, 2001; and $5,500 on August 20, 2001. The Marlborough Account deposits include deposits of $2,028.74 on February 20, 2001; $2,396.58 on March 16, 2001; $2,500 on April 5, 2001; $2,000 on April 13, 2001; $5,481.61 on April 24, 2001; $6,814.01 on May 22, 2001; and $2,033.41 on June 13, 2001.

7. The Defendants requested at the close of trial that the Court take judicial notice of the Petition in the underlying Bankruptcy Case as well as all the Schedules and Statements contained therein, and of the confirmed Chapter 13 Plan. Carlson did not object to this request.

8. Carlson issued a W–2 to Nina Linsey stating that she received a total of $32,606.85 in earnings from Carlson during calendar year 2001. This is the exact figure that the Debtors listed as Nina Linsey's earned income for 2001 on the Statement of Financial Affairs. At trial, it was revealed that part of the $32,606.85 was comprised of extra payroll checks Nina Linsey wrote to herself.

that she generally worked 40 hours per week, although she sometimes worked a few hours of overtime. As such, Nina Linsey's gross salary was approximately $600 per week. Based on this evidence, the Court believes it is reasonable to conclude that any deposits in excess of $2,000 are embezzled funds.

The Court now turns to tracing the funds for each of the eight home improvement checks, applying the "lowest intermediate balance test":

*Plaintiff's Exhibit # 16—Check # 1029 ($2,034)*—Check # 1029 was drawn upon the Community Checking Account on April 6, 2001. The balance in the Community Checking Account at that time was $4,849.74. These funds can be traced back to web transfers from the Community Savings Account to the Community Checking Account on April 2, 2001 in the amount of $5,262.24.[9] As such, the full $4,849.74 in the Community Checking Account on April 6, 2001 was subject to a trust and therefore Check # 1029, in the amount of $2,034, was drawn upon that trust.

*Plaintiff's Exhibit # 1—Check # 1031 ($600) and Plaintiff's Exhibit # 6—Check # 1028 ($2300)*—Following Check # 1029 being drawn upon the Community Checking Account, the balance in that account was $2,655.74. For the reasons discussed, *supra*, this $2,655.74 was subject to the trust. On April 9, 2001 there was another web transfer of $1,600 of trust funds transferred from the Community Savings Account to the Community Checking Account. This brought the amount of the trust (as well as the balance) in the Community Checking Account to $4,255.74. Check # 1031 and check # 1028 (totaling $2,900) were drawn upon these funds and

thus the Court concludes that these checks are subject to the trust.

*Plaintiff's Exhibit # 2—Check # 411 ($600)*—Check # 411 was drawn upon the Marlborough Account on April 19, 2001. A check in the amount of $2,000 was deposited into the Marlborough Account on April 13, 2001. The balance of the Marlborough Account between April 13 and April 19 at all times exceeded $600 and therefore Check # 411 was drawn upon trust funds.

*Plaintiff's Exhibit # 7—Check # 397 ($6,101)*—Check # 397 was drawn upon the Marlborough Account on June 1, 2001. The balance in the Marlborough Account at that time was $6,121.02. These funds can primarily be traced to a deposit made on May 22, 2001 in the amount of $6,814.01. The balance in the Marlborough Account, however, dipped to $5,522 on May 29, 2001. Although deposits were made into the Marlborough Account in the amount of $1,414.01 on May 30, 2001 and $300 on May 31, 2001, there is no evidence, nor can the Court determine with any precision, that these deposits were embezzled funds. Therefore, applying the "lowest intermediate balance test," the Court concludes that $5,522 of Check # 397 was subject to the trust.

*Plaintiff's Exhibit # 8—Check # 1061 ($6,957)*—Check # 1061 was drawn upon the Community Checking Account on June 7, 2001. Deposits of $2,000 and $6,905.24 were made into that account on May 30, 2001 and May 31, 2001, respectively. The balance in the account was reduced to $5,549.37 on June 5, 2001 but a deposit in the amount of $2,561.03, made on June 6, 2001, brought the total funds subject to the

---

9. The web transfer of $5,262.24 is comprised of embezzled funds. Deposits of $4,153.15 and $2,537.45 were made into the Community Savings Account on March 28, 2001 and April 2, 2001, respectively, and the balance of the Community Savings Account did not dip below $5,262.24 between March 28 and the date of the web transfer (April 2, 2001).

590

trust to $8,111.40. The balance between June 6, 2001 and the date that check # 1061 was drawn upon the Community Checking Account did not dip below the amount of check # 1061 ($6,957) and therefore the entire amount of check # 1061 was drawn upon trust funds.

*Plaintiff's Exhibit # 9—Check # 699 ($3,000)*—Check # 699 was drawn upon the Community Checking Account on August 3, 2001. A deposit of $4,500 was made into the Community Checking Account on that same day. Therefore, the entire amount of check # 699 was drawn upon trust funds.

*Plaintiff's Exhibit # 10—Check # 151 ($4,400)*—Check # 151 was drawn upon the Community Checking Account on June 21, 2001. A deposit of $5,615.39 was made into the Community Checking Account on June 19, 2001 and the balance of that account did not dip below the amount of check # 151 ($4,400) between June 19 and June 21, 2001. Therefore, the entire amount of check # 151 was drawn upon trust funds.

Based on the above, the Court concludes that Carlson has met its burden on tracing $25,413 from funds embezzled by Nina Linsey through Nina Linsey's bank account to improvements made to the Property. Nevertheless, the Defendants argue that the homestead filed by the Debtor in August 1994 should defeat the constructive trust. It is well established, however, that a homestead may not be employed as a shield and defense after fraudulently imposing on others. *See Russell v. Black, II,* 2000 WL 1473468, at *3 (Mass.Super.Aug.1, 2000); 40 C.J.S Secundum *Homesteads* § 66 (2002). A homestead exemption does not apply where the homestead was purchased or improved with fraudulently acquired or stolen funds, embezzled funds or trust funds. *See id.; In re Abrass,* 268 B.R. 665, 683 (Bankr.

M.D.Fla.2001). The Defendants have not cited to any authority to take this case outside of the general rule.

The final question before the Court is what is the appropriate remedy. As to the two vehicles, it is admitted that they were purchased with the embezzled funds and thus are subject to a constructive trust in favor of Carlson. *See Mickelson v. Barnet,* 390 Mass. 786, 460 N.E.2d 566 (1984). As to the improved property, the proper remedy is an equitable lien in favor of Carlson in the amount of $25,413. Carlson argued that it is entitled to undivided 32.26% interest in the Property, relying on *Provencher v. Berman,* 699 F.2d 568, 570 (1st Cir.1983). The property in this case, however, can be distinguished from that in *Provencher* because the wrongdoer in this case used the commingled funds to improve the property, rather than buy the property. *See* Bogert, *supra,* § 923 ("if the trust money was not used as the purchase price but rather to pay for improvements on land previously purchased by the defendant with his own money, there can be no tracing into the land ... [h]owever, since its value has been increased by the use of trust funds without the consent of the beneficiary, there is an obvious case for imposition of an equitable lien in his favor").

### Conclusion

For the foregoing reasons, a constructive trust in favor of Carlson Orchards is imposed on the 1999 Plymouth Grand Voyager and the 1995 Ford F–150 and those vehicles are ORDERED turned over to Carlson Orchards. An equitable lien in favor of Carlson Orchards in the amount of $25,413 is hereby placed on the property located at 11 Meadowbrook Road, Hudson, Massachusetts. Upon proper filing of a motion for relief from the automatic stay by Carlson Orchards and subject to the

Court's granting of such motion after notice and an opportunity to be heard, Carlson Orchards may seek to execute on this Judgment in state court.